**[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 646.]**

THE STATE OF OHIO, APPELLEE, *v*. KEENE, APPELLANT.

[Cite as *State v. Keene*, 1998-Ohio-342.]

*Criminal law—Aggravated murder—Selective-prosecution claim is not defense on the merits to criminal charge—Statistical evidence of racial disparity is insufficient to infer discriminatory purpose—Constitutional right to discovery not established, when—Purposeful discrimination not shown, when—Death penalty upheld, when.*

(No. 96-2455—Submitted January 21, 1998—Decided May 13, 1998.)

APPEAL from the Court of Appeals for Montgomery County, No. 14375.

————————————

{¶ 1} Defendant-appellant, Marvallous Keene, was sentenced to death for the aggravated murders of five victims. The offenses occurred on December 24 and 26, 1992. He appeals his convictions and death sentences.

{¶ 2} In December 1992, appellant was consorting with a group of people, including several juveniles, who at various times stayed at Bill McIntire's apartment at 159 Yuma Avenue, Dayton. This group included Laura Taylor, DeMarcus Smith, Nicholas Woodson, Heather N. Mathews, Wendy Cottrill, Marvin Washington, and Jeffrey Wright.

{¶ 3} On December 24, 1992, appellant and Taylor enlisted Mathews to help them rob Joseph Wilkerson, an acquaintance of Taylor's. Taylor told Mathews that she had arranged for the three of them to go to Wilkerson's house on the pretext of having an orgy with Wilkerson. Mathews agreed to take part in the robbery.

{¶ 4} Appellant, Taylor, and Mathews walked to Wilkerson's house. After a drink, Wilkerson and Taylor went to the bedroom. After waiting briefly, appellant and Mathews followed them. Wilkerson began to take his clothes off. Taylor and Mathews pretended to do the same.

{¶ 5} Appellant began to remove his own pants, then pulled them back up and drew a gun. He ordered Wilkerson onto the bed, then commanded Taylor and Mathews to tie Wilkerson's hands to the bed.

{¶ 6} While appellant watched Wilkerson, Taylor and Mathews went through the house, looking for things to steal. They took a microwave oven, a TV, a cordless phone, a curling iron, and a blow dryer, which they loaded into Wilkerson's Buick. Wilkerson told appellant that he kept a .32-caliber derringer in the garage. Appellant found it and brought it back to the bedroom.

{¶ 7} Appellant subsequently confessed that he shot Wilkerson in the chest with the derringer, after covering him with blankets to muffle the noise.

{¶ 8} Taylor and Mathews, hearing the shot, returned to the bedroom and saw appellant holding the derringer. Wilkerson's feet were shaking. Appellant handed the derringer to Taylor, but it would not fire again. So appellant gave Taylor his own gun, and Taylor shot Wilkerson in the head. Wilkerson stopped shaking. Appellant and his accomplices then left in the Buick. Appellant warned his accomplices not to tell Cottrill and Washington.

{¶ 9} Later that evening, appellant, Taylor, and Smith went walking. Appellant and Smith were carrying guns. Appellant later confessed to police that, as they were walking, they saw Danita Gullette at a public telephone. Smith and appellant drew their guns, and Smith forced Gullette at gunpoint to take her shoes off. Smith and appellant then shot Gullette. Smith took her shoes and jacket. When they returned to the apartment, Taylor was wearing Gullette's jacket and Smith was carrying Gullette's shoes.

{¶ 10} Later that night, Smith shot Mathews's boyfriend, Jeffrey Wright, outside 159 Yuma. Appellant, Mathews, Taylor, and Smith then left in Wilkerson's Buick.

{¶ 11} On December 25, appellant returned to Wilkerson's house and stole more items, including Wilkerson's other car, a Pontiac. Also on December 25, Taylor robbed and murdered her former boyfriend, Richmond Maddox.

{¶ 12} Early in the morning of December 26, Mathews drove the Pontiac to a BP service station, where appellant and Smith stole Kathie Henderson's car at gunpoint. Appellant and Smith drove off in Henderson's car; Mathews followed in the Pontiac.

{¶ 13} Later that morning, Mathews drove the Pontiac to the Short Stop Mini-Mart, with appellant, Smith, and Taylor in the car. Taylor went into the store, then came back to report that there were only two people inside. Mathews handed a .32-caliber revolver to Smith; Smith and appellant were also carrying .25-caliber automatic pistols. Appellant and Smith went into the store.

{¶ 14} Sarah Abraham, whose family owned the store, was working behind the cash register. Appellant ordered her at gunpoint to open it. Abraham did so and removed $40, which she handed to appellant. Appellant shot Abraham in the head. Several days later, Abraham died of her wound. Smith also shot at two other people, Jones Pettus, a customer, wounding him, and Edward Thompson, a helper, both of whom survived and testified against appellant.

{¶ 15} Later that day, Taylor and Mathews discussed "jumping" Cottrill because they "thought she was telling on us." According to Mathews's testimony, there was no discussion of shooting her. However, in a subsequent conversation with appellant, Taylor, Mathews, and Woodson, Smith said that "he was going to unload a clip in [Marvin Washington's] ass." According to appellant's confession, Smith "thought that Wendy and Marvin were going to snitch about [Smith] shooting Jeff Wright." The group discussed picking Washington and Cottrill up and taking them "to a park or something."

{¶ 16} The group drove to 159 Yuma and picked up Washington and Cottrill. They dropped Woodson off at his home, then drove to a gravel pit. At the

gravel pit, Smith ordered Washington out of the car, and appellant dragged Cottrill out. Washington and Cottrill protested that they had not gone to the police or "snitched." Appellant and Smith forced them at gunpoint to walk behind a pile of gravel. There, appellant shot Cottrill, and Smith shot Washington.

{¶ 17} The grand jury indicted appellant on eight counts of aggravated murder—two counts each for Wilkerson, Washington, and Cottrill; one count each for Gullette and Abraham. The Wilkerson counts each carried six death specifications (course of conduct, escaping detection, two aggravated robbery, two aggravated burglary). The Cottrill counts each carried four death specifications (course of conduct, witness-murder, two kidnapping). The Washington counts each carried three death specifications (course of conduct, witness murder, kidnapping). The Gullette and Abraham counts each carried two death specifications (course of conduct, aggravated robbery).

{¶ 18} The indictment also included six counts of aggravated robbery, one count of aggravated burglary, one count of burglary, two counts of kidnapping, and two counts of attempted aggravated murder. All counts carried a firearm specification.

{¶ 19} Waiving a jury, appellant was tried to a three-judge panel, which found him guilty on all counts. The panel found four death specifications as to Wilkerson's aggravated murder counts (course of conduct, escaping detection, aggravated robbery, aggravated burglary); however, the panel merged the "escaping detection" and felony-murder specifications.

{¶ 20} The panel found three death specifications on the Cottrill murder (course of conduct, kidnapping-principal offender, witness murder), three on the Washington murder (same), and two on the Gullette and Abraham murders (course of conduct, aggravated robbery). The Wilkerson, Washington, and Cottrill aggravated murder counts were merged so that only one remained for each victim,

4

a total of five. After a mitigation hearing, the panel sentenced appellant to death on each of the five counts. The court of appeals affirmed.

_____

*Mathias H. Heck, Jr*., Montgomery County Prosecuting Attorney, and *Carley J. Ingram*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Tracey A. Leonard* and *J. Joseph Bodine, Jr.,* Assistant State Public Defenders, for appellant.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 21} R.C. 2929.05(A) requires us to undertake a three-part analysis of capital cases. First, we must review the specific issues raised by the appellant with respect to the proceedings below "in the same manner that [we] review other criminal cases." Second, we must independently weigh the aggravating circumstances found by the trier of fact against the mitigating factors existing in the case. Finally, we must consider whether the sentence of death is disproportionate to penalties imposed in similar cases.

{¶ 22} In this appeal, appellant raises twenty-six propositions of law. Finding that none of these claims affords a basis for reversing appellant's convictions or sentences, we overrule all twenty-six propositions of law. We have also independently reviewed appellant's death sentences, as required by R.C. 2929.05(A). As a result, we affirm the death sentences imposed herein.

I

Discriminatory Prosecution

{¶ 23} Appellant filed a motion in the trial court to dismiss the death specifications from the indictment for "discriminatory enforcement." Appellant claimed that the Montgomery County Prosecuting Attorney discriminates against black defendants in exercising his discretion to seek the death penalty. The trial

court denied the motion to dismiss, and also denied appellant's requests for discovery and an evidentiary hearing on his discriminatory-prosecution claim.

{¶ 24} In his first proposition of law, appellant claims that the trial court should have afforded discovery and a hearing on his discriminatory-prosecution claim. He relies on both Crim.R. 16 and federal constitutional law. We begin by analyzing his Crim.R. 16 claim.

{¶ 25} Crim.R. 16(B)(1)(f) requires the prosecutor to disclose "all evidence * * * favorable to the defendant and material either to guilt or punishment." According to appellant, evidence that the prosecuting attorney has discriminated against black defendants in seeking the death penalty would be both "favorable" to him and "material to * * * punishment." Such evidence, appellant contends, would be "favorable" because it would support his claim of discriminatory prosecution. And it would be "material to * * * punishment," he contends, because it has to do with the prosecuting attorney's charging practices in seeking the death penalty. Appellant therefore contends that any evidence in the prosecutor's possession that supports his claim of discrimination is discoverable under Crim.R. 16(B)(1)(f).

{¶ 26} However, the history of the rule's language, "favorable to the defendant and material to guilt or punishment," suggests a different interpretation. That phrase comes directly from *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215, 218, which requires the state to disclose "evidence favorable to an accused * * * where the evidence is material either to guilt or to punishment." We therefore conclude that the terms "favorable" and "material" in Crim.R. 16(B)(1)(f) have the same meaning as they do in *Brady* and its progeny.

{¶ 27} Under *Brady*, "evidence favorable to an accused [and] * * * material either to guilt or to punishment" is generally construed to encompass only exculpatory, mitigating, and impeachment evidence. "Thus the principles of *Brady*

do not apply unless the evidence is material to mitigation, exculpation or impeachment." *Calley v. Callaway* (C.A.5, 1975), 519 F.2d 184, 221.

{¶ 28} Appellant's selective-prosecution claim does not fall within those categories. "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong* (1996), 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687, 689. Similarly, appellant's selective-prosecution claim is not a "defense on the merits" to the death penalty; that is, the claim goes neither to appellant's eligibility for the death penalty nor to whether his offenses merit death. Instead, his claim is that the death penalty may not be applied because the prosecutor sought it "for reasons forbidden by the Constitution." *Id.*

{¶ 29} We conclude that evidence relevant to a selective-prosecution claim is not "favorable to an accused [and] * * * material either to guilt or to punishment" within the meaning of *Brady* and Crim.R. 16(B)(1)(f); therefore, such evidence is not discoverable under the rule.

{¶ 30} Having rejected appellant's state-law claim, we must assess appellant's claim that the trial judge had a constitutional obligation to allow discovery.

{¶ 31} In *United States v. Armstrong*, the court held that a defendant, in order to obtain discovery on a selective-prosecution claim, must "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not * * *."[1] 517 U.S. at 469, 116 S.Ct. at 1488, 134 L.Ed.2d

---

1. *Armstrong* does not expressly state that the right to discovery on a claim of racially discriminatory prosecution is grounded in the Constitution (and hence applicable to state as well as federal prosecutions). However, the parties to this case have proceeded on the assumption that the discovery right is constitutionally grounded. We think that assumption correct, since the discovery right outlined in *Armstrong* derives from, and is meant to enforce, the Fourteenth Amendment's prohibition of racially discriminatory prosecutions.

at 701. The standard is deliberately "rigorous," 517 U.S. at 468, 116 S.Ct. at 1488, 134 L.Ed.2d at 701, because "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id*. at 464, 116 S.Ct. at 1486, 134 L.Ed.2d at 698.

{¶ 32} Appellant failed to produce some evidence that similarly situated defendants could have been prosecuted but were not.

{¶ 33} Appellant points to the treatment of his white co-defendant, Mathews. Mathews was indicted with death specifications, but the prosecutor dropped the specifications in exchange for Mathews's testimony against appellant. Why, appellant asks, did the prosecutor not bargain with him and seek the death penalty for Mathews?

{¶ 34} Appellant was the triggerman in four of the five aggravated murders involved here. Mathews was charged with only two of these murders. In neither case did Mathews pull the trigger. Indeed, the record discloses no clear evidence that Mathews actually intended the deaths of Wilkerson and Abraham. Mathews, therefore, is not a "similarly situated" defendant.

{¶ 35} Appellant also cites the case of three white defendants who went on what appellant describes as a killing spree involving the robbery, burglary, and murder of *two* victims. Appellant alleges that "the same" death specifications could have been lodged, yet the Montgomery County Prosecutor did not seek the death penalty. However, the state contends that the evidence against these defendants was significantly weaker than the evidence against appellant. Two of the defendants received plea bargains and testified against the third; in spite of this, the third defendant was acquitted of one of the two murders.

{¶ 36} Appellant claims that sixty-four percent of capital indictments in Montgomery County since 1981 have been lodged against black defendants, while the county's population was only seventeen percent black. However, as the court of appeals noted, this statistic creates no inference of discrimination by itself.

Appellant did not show the percentage of black and white defendants in potentially capital cases who were indicted *without* capital specifications. Without that, there can be no meaningful comparison.

**{¶ 37}** Appellant's contrary argument appears to rest on a presumption that, if seventeen percent of the county's population is black, then blacks must have committed about seventeen (or, at any rate, substantially less than sixty-four) percent of potentially capital crimes. Appellant argues that even to question that presumption would constitute forbidden racial stereotyping. However, that cannot be correct, for the *Armstrong* court itself rejected a presumption " 'that people of *all* races commit *all* types of crimes.' " (Emphasis *sic*.) 517 U.S. at 469, 116 S.Ct. at 1488, 134 L.Ed.2d at 701, quoting *United States v. Armstrong* (C.A.9, 1995), 48 F.3d 1508, 1516-1517.

**{¶ 38}** In any event, statistical evidence does not satisfy *Armstrong*'s requirement that the defendant identify similarly situated defendants who could have been prosecuted, but were not. "[T]he general rule [is] that in cases involving discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose." *United States v. Olvis* (C.A.4, 1996), 97 F.3d 739, 746, quoting *McCleskey v. Kemp* (1987), 481 U.S. 279, 297, 107 S.Ct. 1756, 1769-1770, 95 L.Ed.2d 262, 281. The state has no duty to explain such a statistical disparity. *Olvis*, 97 F.3d at 746.

**{¶ 39}** Appellant also points out that the Montgomery County Prosecuting Attorney has never *obtained* a death sentence against a white defendant. This is quite irrelevant, however, since appellant claims discrimination in *charging* practices.

**{¶ 40}** We conclude that appellant failed to show "some evidence" that *similarly situated* defendants of other races could have been charged with death

penalty specifications but were not. Therefore, he did not establish a constitutional right to discovery on his claim.

{¶ 41} Appellant also claims that he was entitled to an evidentiary hearing on his due-process claim. Again, he raises both a federal constitutional claim and a state-law claim.

{¶ 42} Citing *United States v. Hazel* (C.A.6, 1983), 696 F.2d 473, 475, appellant contends that due process entitled him to a hearing because he presented sufficient facts to raise a reasonable doubt as to the prosecutor's purpose. However, for the same reasons that he was not entitled to discovery, he was not entitled to a hearing. The facts he presented do not raise a reasonable doubt as to the prosecutor's purpose.

{¶ 43} Appellant further argues that Ohio law entitles a defendant to a hearing on any pretrial motion that "states the motion's legal and factual bases with sufficient particularity to place the prosecutor and the court on notice of the issues to be decided." For this assertion, he cites Crim.R. 12(B) and *State v. Shindler* (1994), 70 Ohio St.3d 54, 636 N.E.2d 319, syllabus.

{¶ 44} However, *Shindler* involved a motion to suppress evidence found in a warrantless search. In that situation, the prosecutor bore the burden of proving the legality of the search. With a selective-prosecution claim the burden is upon the defendant; the prosecutor is presumed not to have discriminated. "In order to dispel [that] presumption * * * , a criminal defendant must present 'clear evidence to the contrary.' " *Armstrong*, 517 U.S. at 465, 116 S.Ct. at 1486, 134 L.Ed.2d at 698-699, quoting *United States v. Chem. Found., Inc.* (1926), 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131, 143. We agree with the court of appeals that *Shindler* is distinguishable. Appellant's first proposition of law is overruled.

{¶ 45} In his fourteenth proposition of law, appellant argues that the evidence he submitted was *by itself* enough to show racial bias on the part of the

county prosecutor. Therefore, he argues, his convictions should be reversed.[2] Yet, appellant candidly admits that he "did not prove that the prosecutor purposefully intended to discriminate against him. Therefore, he has not met the burden for this type of claim as enunciated in *McCleskey v. Kemp* * * * ."

{¶ 46} This concession would seem fatal to appellant's claim. However, appellant argues that—despite *McCleskey*—he was not required to prove purposeful discrimination against him.

{¶ 47} First, he argues that the state, by successfully opposing his motion for discovery and a hearing, made it impossible to establish discriminatory purpose. Thus, he argues, the prosecutor "waived the *McCleskey* requirements." But we can see no sense in penalizing the prosecutor for successfully opposing appellant's motion.

{¶ 48} Next, appellant tries to distinguish *McCleskey* on its facts. But the requirement of proving purposeful discrimination was not a novel creation of the *McCleskey* court and cannot be limited to the specific facts of *McCleskey*. Rather, it is a basic and generally applicable principle of Fourteenth Amendment equal protection analysis that a party claiming an equal protection violation has the burden of proving purposeful discrimination. *McCleskey*, 481 U.S. at 292, 107 S.Ct. at 1767, 95 L.Ed.2d at 278, quoting *Whitus v. Georgia* (1967), 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599, 603-604. See, also, *Armstrong*, 517 U.S. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699, quoting *Wayte v. United States* (1985), 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556.

{¶ 49} Finally, appellant argues that we should construe the Ohio Constitution to require a finding of racially biased charging decisions in capital cases "upon a showing of disparate impact, without a need to prove the prosecutor's

---

2. Presumably, appellant means his *death sentences* should be reversed; he makes no claim that the prosecutor's decision to prosecute him in the first place was tainted by discrimination.

subjective intent." But appellant offers no textual analysis of the state constitutional provisions he purports to rely upon (Ohio Constitution, Article I, Sections 1, 9, 10, 16, and 20), cites no precedent construing those provisions as he suggests, and states no reason why we should so construe them.

{¶ 50} Appellant concedes that he has not met his burden of proving that the prosecutor purposely discriminated against him in charging him with capital offenses, and he offers no persuasive reason to relieve him of this burden. We therefore overrule his fourteenth proposition of law.

II

Evidentiary Sufficiency

{¶ 51} In his sixth proposition of law, appellant contends that the state failed to adduce sufficient evidence to prove his guilt of certain death specifications.

A. Wendy Cottrill—Marvin Washington

{¶ 52} Counts Sixteen, Seventeen, Nineteen, and Twenty charged appellant with the aggravated murders of Cottrill and Washington. Each count carried a death specification under R.C. 2929.04(A)(8), charging that appellant murdered the victims "to prevent [their] testimony in any criminal proceeding." Appellant claims that the state failed to prove the (A)(8) specifications. However, his claim is based on a patent misreading of R.C. 2929.04(A)(8).

{¶ 53} Under R.C. 2929.04(A)(8), it is an aggravating circumstance that "[t]he victim * * * was a witness to an offense who was purposely killed to prevent his testimony in *any criminal proceeding* * * * or * * * in retaliation for his testimony in any criminal proceeding." (Emphasis added.)

{¶ 54} The state's evidence showed that appellant murdered Cottrill and Washington because they had seen Smith shoot Wright. However, appellant claims that, if he killed the victims to prevent their testimony *against Smith*, the (A)(8) specification does not apply. According to appellant, the specification would apply only if he killed them to prevent them from testifying *against appellant*.

12

**{¶ 55}** Appellant's argument is inconsistent with the plain language of the statute. R.C. 2929.04(A)(8) says "*any* criminal proceeding." No language limits it to cases where the victim witnessed a crime *committed by his killer*. Nor would such a limitation make sense: appellant's reading of R.C. 2929.04(A)(8) would shield an organized-crime assassin who murdered witnesses to protect his fellow gangsters.

**{¶ 56}** Appellant argues, "Under the State's logic, anyone could be charged with a capital specification as long as the individual they [*sic*] murdered, at one time, was a witness to a crime." That is incorrect. The (A)(8) specification applies only where the murder was committed "*to prevent* [the victim's] testimony * * * or * * * *in retaliation for* his testimony." (Emphasis added.)

**{¶ 57}** The state adduced sufficient evidence to permit a finding that appellant killed Cottrill and Washington to prevent them from testifying against Smith. Therefore, the evidence supports appellant's conviction on the (A)(8) specifications.

### B. Joseph Wilkerson

**{¶ 58}** Appellant contends that he was not proven to be the principal offender in this murder because the coroner did not testify that his bullet caused Wilkerson's death. Appellant appears to assume that the state had to prove appellant's bullet was the sole cause of death. We disagree. We have said that "principal offender" means "the actual killer." *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746. However, we have never held that it means "the *sole* offender." There can be more than one actual killer—and thus more than one principal offender—in an aggravated murder. See *State v. Joseph* (1995), 73 Ohio St.3d 450, 469, 653 N.E.2d 285, 300 (Moyer, C.J., dissenting in part and concurring in part).

**{¶ 59}** The coroner testified that Wilkerson died of multiple gunshot wounds and that appellant's shot to Wilkerson's heart would by itself have killed

Wilkerson. Thus, the fact that Taylor finished Wilkerson off does not alter appellant's role as a principal offender.

## C. Danita Gullette

**{¶ 60}** Some evidence indicates that the shots fired by appellant in this killing may not have been fatal by themselves. Appellant said in his confession that he fired "not that many" shots at Gullette. The two bullets recovered from Gullette's body were fired from two different guns, which means appellant shot her at least once, but it is unknown which gun he fired. The coroner stated that only one of Gullette's wounds would have been *immediately* fatal *by itself*.

**{¶ 61}** Nonetheless, the coroner testified that Gullette died of "multiple" gunshot wounds. His testimony supports an inference that appellant's shots at least contributed to Gullette's death. Thus, we hold that the evidence was sufficient to prove that appellant was a principal offender in the Gullette murder. See *Holsemback v. State* (Ala.Crim.App.1983), 443 So.2d 1371, 1381-1382; *Cox v. State* (1991), 305 Ark. 244, 248-249, 808 S.W.2d 306, 309; *People v. Bailey* (1996), 451 Mich. 657, 676-678, 549 N.W.2d 325, 334.

## D. Kathie Henderson

**{¶ 62}** Finally, appellant contends that the state failed to prove the attempted aggravated murder of Kathie Henderson. However, *appellant was never charged with that crime*. Only Counts Twelve and Fourteen of the indictment charged appellant with attempted aggravated murder. The bill of particulars shows that those counts related to the attempted aggravated murders of Pettus and Thompson, respectively. The only count charging appellant with a crime against Henderson was Count Eight, which charged aggravated *robbery*—not aggravated murder. We overrule all aspects of appellant's sixth proposition of law.

### III

### Suppression Issues

14

{¶ 63} On December 26, 1992, appellant was arrested. At the police station, he was taken to an interrogation room, where he sat for about three hours, until Detectives Tom Lawson and Wade Lawson arrived. Tom Lawson administered *Miranda* warnings. Appellant stated orally that he understood his rights. After the warnings were completed, appellant agreed to answer questions and signed a Dayton Police Department waiver form to signify that he understood his rights and was willing to answer questions. He answered questions for forty-five minutes. After that, the detectives recorded appellant's statement on videotape. The next day, the detectives re-advised appellant of his rights and interviewed him again.

{¶ 64} In his fifth proposition of law, appellant claims that the trial court should have suppressed his confessions of December 26 and 27, 1992, because the state did not prove that his waiver of *Miranda* rights on December 26 was voluntary, knowing, and intelligent.

{¶ 65} Voluntariness is a legal question for a reviewing court to determine independently. See, *e.g.*, *Beckwith v. United States* (1976), 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1, 8. However, this court must defer to the trial court's *factual* findings, if those are supported by the record. See, *e.g.*, *State v. Wilson* (1996), 74 Ohio St.3d 381, 390, 659 N.E.2d 292, 303.

{¶ 66} Appellant argues that police misconduct, combined with his own intoxication and "psychological deficits," rendered him unable to voluntarily waive his rights. He claims that, on the day of his arrest, he ingested two fifths of wine, eighty ounces of beer, and several pills (Valium, Xanax, and Dalmane). He claims that, despite his repeated requests, police denied him permission to use the bathroom for seven hours on December 26, until they were through interrogating him.

{¶ 67} As to police misconduct and intoxication, appellant's claims are based wholly upon his own self-serving testimony at the suppression hearing. However, appellant's testimony was contradicted by several Dayton police officers.

The trial court accepted the police testimony as true and found that appellant's testimony was not credible.

**{¶ 68}** The court specifically rejected appellant's testimony that he was intoxicated. The court noted that appellant had displayed a "lucid memory" in his own testimony. Moreover, appellant was driving Henderson's car when he was arrested. The trial court pointed out that, if appellant "had ingested the amount of wine and pills which he claims, * * * he would be unconscious and certainly not able to operate a motor vehicle."

**{¶ 69}** Based on police testimony and appellant's videotaped confession, the court found that appellant appeared "normal, alert * * * lucid and oriented"; that he "was in full command of his senses" and "aware of the seriousness of the charges"; and that he showed no signs of intoxication.

**{¶ 70}** Moreover, the trial court found, contrary to appellant's testimony, that appellant was permitted, at his request, to use the bathroom before the December 26 interrogation. This finding was supported by the testimony of Detective Sergeant John Huber and Patrolman Herb Rogers, who escorted appellant to the bathroom about one-half hour after he was brought in. Also, Detective Wade Lawson testified that he permitted appellant to use the bathroom during his interrogation.

**{¶ 71}** Since the hearing record supports the trial court's findings of fact, we are bound thereby. Thus, to the extent appellant's arguments rest on his own testimony, which the trial court disbelieved, they are invalid. See *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711, 719.

**{¶ 72}** Appellant also claims that his waiver was not knowing and intelligent. On this issue, appellant relies upon the testimony of Dr. Eugene S. Cherry, a psychologist.

**{¶ 73}** Dr. Cherry felt that appellant's waiver was not knowing and intelligent because the Dayton Police waiver form contains only one signature line.

By signing, the suspect both acknowledges understanding of his rights and waives them. Because appellant is a "passive, dependent" personality, Cherry felt appellant could not be assumed to have understood his rights unless someone "required [him] to actively assert his understanding * * * ." To ensure that appellant really understood his rights instead of just going along, Cherry felt the police should have had appellant acknowledge his rights separately from waiving them.

{¶ 74} Here again, however, the trial court rejected Dr. Cherry's testimony. The court had ample grounds to do so; Cherry admitted his opinion was "really not well established." Moreover, Cherry assumed that appellant's claim of intoxication was true; that claim was ultimately rejected by the trial court. Since we cannot second-guess the trial court's factual findings, appellant's reliance on Cherry's testimony is misplaced. Appellant's fifth proposition of law is overruled.

{¶ 75} In his tenth proposition of law, appellant claims the testimony of Henderson, identifying appellant as the man who pointed a gun at her on December 26, was tainted by an improper photographic lineup and should have been suppressed. See *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401.

{¶ 76} We note that, even if appellant were to prevail on this issue, Henderson's testimony was relevant only to Count Eight, which charged appellant with aggravated robbery for stealing Henderson's car at gunpoint. Although appellant seems to contend otherwise, this issue does not affect his death sentences.

{¶ 77} Henderson had described her assailant as having a "box" haircut. Appellant was the only suspect in the photo lineup with such a haircut. Appellant argues, with some persuasiveness, that it was unnecessarily suggestive to arrange a lineup with only one distinctive box haircut in it.

{¶ 78} The state argues that, even if the lineup was suggestive, Henderson's identification of appellant was reliable under the totality of the circumstances, and hence admissible.

{¶ 79} We find reliability to be a close question on the facts of this case. However, assuming that the identification was erroneously admitted, the error was harmless. Appellant confessed that he stole a car at the BP service station on the morning of December 26. Mathews testified that she saw him do it. Appellant was actually *in* Henderson's car when he was arrested. Moreover, the plates on that car belonged to Wilkerson's Pontiac, which appellant also admitted he stole; the Pontiac, in turn, was found with one of Henderson's plates on it. On this evidence, it is clear beyond a reasonable doubt that appellant would have been convicted on Count Eight even without Henderson's identification. Appellant's tenth proposition of law is overruled.

IV

Jury Waiver

{¶ 80} A waiver of a defendant's jury trial right must be voluntary, knowing, and intelligent. *State v. Ruppert* (1978), 54 Ohio St.2d 263, 271, 8 O.O.3d 232, 236, 375 N.E.2d 1250, 1255. In his ninth proposition of law, appellant argues that his jury trial waiver was invalid because of his "propensity to acquiesce to authority figures."

{¶ 81} The trial judge conducted the following colloquy with appellant:

"THE COURT: First of all, do you understand that you are entitled to have your case tried to a jury of twelve people?

"MR. KEENE: Yes, sir.

"THE COURT: Do you understand that in that event you could not be convicted of any one or more of these charges unless all twelve jurors were to agree on your guilt?

"MR. KEENE: Yes, sir.

"THE COURT: Now, you have the right under the statutes and the Constitution of the State of Ohio to waive or give up that right by jury [*sic*] and have your case tried to a court consisting of three judges. Do you understand that?

"MR. KEENE: Yes, sir.

"THE COURT: Now, after your discussion with your attorneys, do you understand that this is a constitutional as well as a statutory right to trial by jury?

"MR. KEENE: Yes, sir.

"THE COURT: And * * * you fully understand this right?

"MR. KEENE: Yes, sir.

"THE COURT: And you have discussed this with your attorneys on more than one occasion, I'm sure. Is that right?

"MR. KEENE: Yes, sir.

"THE COURT: And after giving careful consideration to it, is it your desire to waive — and again by that I mean give up your right to trial by jury and proceed before a three-judge panel?

"MR. KEENE: Yes, sir.

"THE COURT: Do you understand that the panel will consist of the Court— this Court * * * and two other judges to be designated by the Chief Justice * * * ?

"MR. KEENE: Yes, sir."

{¶ 82} Appellant signed a jury waiver in open court. The trial judge then continued:

"THE COURT: Before the Court accepts these waivers, Mr. Keene, has anyone promised you anything in order to get you to give up that right?

"MR. KEENE: No, sir.

"THE COURT: Has anyone threatened you or otherwise brought pressure upon you, twisted your arm, to get you to give up that right?

"MR. KEENE: No, sir.

"THE COURT: * * * I understand, therefore, that it's under careful consideration, consultation * * * with your attorneys that you feel it is in your best interests to proceed in this manner? * * *

"MR. KEENE: Yes, sir."

**{¶ 83}** Appellant claims that this colloquy, and the written waiver that accompanied it, are insufficient to prove that he voluntarily, knowingly, and intelligently waived his right to a jury trial. Appellant bases this argument on Dr. Cherry's testimony from the suppression hearing regarding appellant's "personality style." Cherry had testified that appellant was a "follower" and a "passive, dependent type." Therefore, Cherry believed, appellant could not be assumed to have understood his rights unless someone "required [him] to actively assert his understanding * * * ."

**{¶ 84}** Based on Dr. Cherry's opinion, appellant argues that the trial court should have conducted the colloquy so as to require him to "actively assert his understanding" of his jury trial right. Appellant claims that the trial court's "yes or no" questions elicited mere "mechanical responses" that do not demonstrate a genuinely knowing and intelligent decision on appellant's part.

**{¶ 85}** Yet the trial court had already rejected Cherry's testimony as ill-founded. Cherry's testimony, rejected by the trial court, is simply not a sufficient basis for impeaching appellant's waiver.

**{¶ 86}** Even if Cherry's opinion had been accepted, appellant cites no precedent requiring a trial court to take a defendant's individual "personality style" into account when inquiring into the validity of his jury waiver. Indeed, a trial court may accept a defendant's jury waiver without any such inquiry at all. "There is no requirement for a trial court to interrogate a defendant in order to determine whether he * * * is fully apprised of the right to a jury trial." *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus. Accord *United States v. Martin* (C.A.6, 1983), 704 F.2d 267, 274. Appellant's ninth proposition of law is overruled.

V

Evidentiary Issues

**{¶ 87}** Appellant claims in his seventh proposition of law that the state used "other acts" evidence to attack his character, violating Evid.R. 404(B), which reads, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes * * * ."

**{¶ 88}** Appellant claims that the state erred by introducing evidence involving Taylor's murder of Maddox. Appellant had agreed to help Taylor rob Maddox, but there was no evidence that he was involved in the murder, and he was not charged with any crimes against Maddox.

**{¶ 89}** We agree that this uncharged crime was irrelevant. However, we find the error harmless. Appellant confessed to the five murders he was charged with. Evidence of his minor participation in Taylor's scheme to rob Maddox could not have done much further damage to appellant's character. Moreover, the prosecutor did not use the evidence to show that appellant was a person of bad character. Finally, the trier of fact was a three-judge panel. See *State v. Post* (1987), 32 Ohio St.3d 380, 513 N.E.2d 754.

**{¶ 90}** Appellant also claims that evidence involving the shooting of Wright was "other acts" evidence. But this crime was clearly introduced for a valid purpose having nothing to do with appellant's character. One of the death specifications for the Cottrill-Washington murders alleged that the victims were killed because they were witnesses to a crime—and Smith's shooting of Wright was the crime they witnessed. Therefore, the state did not violate Evid.R. 404(B) by proving that Smith shot Wright.

**{¶ 91}** Woodson testified that he saw appellant shoot an unidentified robbery victim, and that appellant told him about yet another shooting. The defense did not object, so these issues are waived. Appellant's seventh proposition of law is overruled.

{¶ 92} Appellant's sixteenth proposition of law reargues issues raised in his seventh proposition of law with regard to Woodson's testimony. Appellant's sixteenth proposition of law is overruled.

{¶ 93} In his eleventh proposition of law, appellant argues that the state introduced "victim impact" evidence in the guilt phase, where such evidence is inadmissible. See, *e.g.*, *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576. However, appellant objected to only one of the alleged errors.

{¶ 94} Over objection, Gullette's friend, Angela Martin, testified that she had a close relationship with Gullette and that they borrowed each other's clothes. However, the panel properly overruled the objection. Gullette had borrowed Martin's jacket the night she was killed; that was the same jacket stolen from Gullette, and Martin identified it. Martin's relationship with Gullette explains how Martin could identify the jacket and why Gullette was wearing it. Thus, it was relevant for a nonvictim-impact purpose.

{¶ 95} As to other alleged "victim impact" testimony, appellant did not object, so these issues are waived. We overrule appellant's eleventh proposition of law.

{¶ 96} In his seventeenth proposition of law, appellant argues that Gullette's Fila sneakers should have been excluded due to the state's failure to prove an unbroken chain of custody. However, the state was not required to prove a perfect, unbroken chain of custody. The break identified by appellant was minor. We find no error in the admission of the sneakers. (The alleged error would be harmless in any event. Appellant confessed to shooting Gullette while robbing her, and specifically described to police how Smith stole Gullette's sneakers after forcing her to take them off.) Appellant's seventeenth proposition of law is overruled.

{¶ 97} In capital cases, gruesome photographs are inadmissible if their probative value is outweighed by the danger of unfair prejudice, or the photos are

repetitive or cumulative. See, *e.g.*, *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267. Appellant argues in his eighteenth proposition of law that State's Exhibits 117, 118, 119, 138, 139, 140, and 148, which are autopsy slides, were unfairly prejudicial and/or cumulative. However, appellant did not object to these slides at trial, so this issue is waived. We overrule appellant's eighteenth proposition of law.

## VI

### Sentencing Issues

#### A. Sentencing Opinion

{¶ 98} In his second proposition of law, appellant argues that the three-judge panel failed to conduct a proper sentencing analysis.

{¶ 99} Appellant argues that the panel erred by referring to "the cold and calculated plans that were developed, the deliberate execution of those plans and the manner and means by which five people were killed * * * ." Appellant claims that these were "non-statutory aggravating circumstances" and are unconstitutionally vague under *Maynard v. Cartwright* (1988), 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372, and *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398.

{¶ 100} However, the panel's opinion recited the specific statutory aggravating circumstances of which appellant was convicted. There is no indication that the panel believed the "calculated," "deliberate" nature of these murders or the "manner and means" of their commission were aggravating circumstances. See, *e.g.*, *State v. Moreland* (1990), 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905. Rather, the panel was explaining *why* the aggravating circumstances outweighed the mitigating factors. See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 101} Appellant also argues that the trial court weighed a *statutory* aggravating circumstance, R.C. 2929.04(A)(3), "that did not exist in this case."

Appellant was found guilty of an (A)(3) "escaping detection" specification and an (A)(7) felony-murder specification as to each of the Wilkerson aggravated murder counts. However, the panel merged the (A)(3) specifications into the (A)(7) specifications.

{¶ 102} Later in its opinion, the panel wrote, "The panel having previously found the Defendant guilty of specifications under R.C. 2929.04(A)*(3)*, (5), (7) and (8), it is necessary to address all mitigation circumstances developed by the evidence * * * ." (Emphasis added.)

{¶ 103} Appellant argues that this meant the panel was *weighing* the (A)(3) specifications—which, having merged with the (A)(7) specifications, should not have been weighed. We disagree. On its face, the quoted sentence says nothing about weighing or considering the (A)(3) specifications. Rather, the panel was simply reciting the specifications of which it had found appellant guilty. Only a few pages earlier, the panel had stated that the (A)(3) specifications merged into the (A)(7) specifications. It cannot be rationally believed that the panel forgot about that and weighed the (A)(3) specifications.

{¶ 104} Appellant's Eighth Amendment vagueness claim lacks merit. See *Tuilaepa v. California* (1994), 512 U.S. 967, 971-975, 114 S.Ct. 2630, 2634-2636, 129 L.Ed.2d 750, 759-761; *State v. Gumm* (1995), 73 Ohio St.3d 413, 417-418, 653 N.E.2d 253, 260.

{¶ 105} In *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus, this court held, "Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." Appellant claims that the panel weighed all the aggravating circumstances collectively against the mitigating factors, rather than assessing the penalty for each individual count separately as *Cooey* requires.

{¶ 106} The sentencing opinion states, "In conclusion, after fully and carefully considering all the evidence presented, * * * we unanimously find * * *

that the aggravating circumstances found *with respect to each aggravated murder count* outweigh the several mitigating factors * * * ." (Emphasis added.)

**{¶ 107}** The "with respect to each" language suggests that each count was evaluated separately. If any ambiguity remains, the verdict forms clarify it. The panel signed a separate verdict for each victim. The verdict on Count Four states, "We do find that the aggravating circumstances *in the aggravated murder of Joseph Wilkerson* outweigh the mitigating circumstances [*sic*]." (Emphasis added.) The same language is used with respect to Counts Six (Gullette), Ten (Abraham), Seventeen (Cottrill), and Twenty (Washington). Thus, *as to each individual aggravated murder*, the panel made a specific finding that the aggravating circumstances present *with respect to that aggravated murder* outweighed the mitigating factors.

**{¶ 108}** Finally, as part of his second proposition of law, as well as in his twenty-fifth proposition of law, appellant argues that the panel incorrectly believed that the death penalty was mandatory. The opinion states, "In conclusion * * * we unanimously find beyond a reasonable doubt that the aggravating circumstances found with respect to each aggravated murder count outweigh the several mitigating factors established by a preponderance of the evidence. *Following these conclusions*, the law of this State requires the imposition of the death penalty * * * ." (Emphasis added.)

**{¶ 109}** Clearly, the panel did not incorrectly believe that the death penalty was mandatory. Rather, it correctly believed that, *having found aggravation to outweigh mitigation*, it was required to impose the death penalty. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 349, 595 N.E.2d 902, 912.

**{¶ 110}** Appellant's second and twenty-fifth propositions of law are overruled.

**{¶ 111}** In his third proposition of law, appellant claims that the death sentence should not have been imposed in this case. Appellant argues that the

mitigating factors outweigh the aggravating circumstances so that the death penalty is inappropriate, and asks this court to reverse the sentence of death. Our independent sentence determination, *infra*, will resolve this issue.

## B. Duplicative Aggravating Circumstances

{¶ 112} In his fourth proposition of law, appellant argues that Count Four was invalid because it charged him with murder during a "burglary *and/or* robbery." (Emphasis added.) However, he concedes that he never raised this issue at trial. Consequently, it is waived. There is no plain error, because appellant was separately convicted of both aggravated burglary (Count One) and aggravated robbery (Count Two) with respect to Wilkerson. Therefore, the outcome would not clearly have been otherwise had the indictment been worded differently. See, *e.g.*, *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 197-198, 616 N.E.2d 909, 919.

{¶ 113} Appellant argues that this alleged error is "plain error *per se*," and cannot be waived by lack of objection. We reject this claim, which is inconsistent with our precedents holding that similar alleged errors were waived.[3] Appellant's fourth proposition of law is overruled.

{¶ 114} One of the specifications to Count Four alleged murder during an aggravated burglary; another alleged murder during an aggravated robbery. In appellant's thirteenth proposition of law, he argues that *if* this court rejects his fourth proposition of law on the ground that the aggravated robbery and aggravated burglary "were in fact the same event," then the aggravating circumstances based on them should have merged into one. However, we have rejected appellant's

---

3. Appellant's claim is based on a misreading of *United States v. Beros* (C.A.3, 1987), 833 F.2d 455, and *State v. Johnson* (1989), 46 Ohio St.3d 96, 104, 545 N.E.2d 636, 644. In *Beros*, the question of waiver and plain error never came up because "a sufficient objection was made * * * to preserve [the duplicity] issue for appeal." 833 F.2d at 458, fn. 3; see, also, *id.* at 462-463. *Johnson* does not discuss waiver or plain error at all with regard to the duplicity issue. See 46 Ohio St.3d at 104-105, 545 N.E.2d at 644.

fourth proposition of law on other grounds. Consequently, appellant's thirteenth proposition of law lacks merit.

## C. Length of Deliberations

{¶ 115} The record shows that the three-judge panel retired to deliberate at 3:37 p.m. and returned with a sentencing decision at 4:55 p.m., one hour and eighteen minutes later. In his twenty-first proposition of law, appellant claims that the panel completed its deliberations too quickly. But he cites no authority for the proposition that an appellate court may second-guess whether the trier of fact deliberated long enough.

{¶ 116} In his twenty-second proposition of law, appellant claims that the panel actually returned at 4:40 p.m., not 4:55. It is undisputed that, pursuant to App.R. 9(E), appellant filed a motion in the trial court to correct the record; in support, he adduced an affidavit by trial counsel stating that the panel returned at 4:40 p.m. The trial court denied the motion. Noting that the record was made "contemporaneously," the court declined to modify it based on the year-old recollection of trial counsel. Appellant argues that the trial court violated App.R. 9(E) by denying his motion.

{¶ 117} App.R. 9(E) states in part, "If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by the court and the record made to conform to the truth." Thus, "it is within the province of the trial court to resolve disputes about the record on appeal." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 81, 564 N.E.2d 54, 66. Here, the trial court did resolve the dispute; it found the year-old recollection of the former counsel for an interested party insufficiently persuasive to impeach the stenographic record. "Where it is supported by competent, reliable evidence, such ruling will not be reversed by a reviewing court absent an abuse of discretion." *Id*. at 82, 564 N.E.2d at 67. Appellant's twenty-first and twenty-second propositions of law are overruled.

## VII

### Recusal

**{¶ 118}** In his eighth proposition of law, appellant claims that Judge Robert Brown, who presided over the suppression hearing, should have recused himself from the three-judge panel that tried the case.

**{¶ 119}** During the suppression hearing, appellant testified on his own behalf.  On cross-examination, the prosecutor asked appellant several questions relating to  the facts of the charged offenses.  Judge Brown overruled a defense objection, noting that appellant's testimony could not be used against him at trial. (See *Simmons v. United States* [1968], 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259.)  At one point defense counsel informed the judge that "there is a potential of having a three-judge panel."  The judge said, "In that event I'll remove myself."  Ultimately, the case was indeed tried to a panel, but Judge Brown did not recuse himself and sat on the panel.

**{¶ 120}** Appellant never filed a motion for Judge Brown's recusal.  This failure alone would waive this issue.  Furthermore, appellant's written jury waiver, signed and filed while Judge Brown was presiding, specifically states, "I * * * consent to be tried by a Court to be composed of three Judges, consisting of *the Judge presiding at this time* and two other Judges to be designated by the Chief Justice * * * ."  (Emphasis added.)  We reject appellant's eighth proposition of law.

## VIII

### Prosecutorial Misconduct

**{¶ 121}** In his fifteenth proposition of law, appellant claims prosecutorial misconduct.

**{¶ 122}** In guilt-phase closing arguments, the prosecutor described the crimes as "brutal, heinous, violent," and stated that "only a person without regard for or concern for or appreciation of the value of human life could commit" such

crimes. But a prosecutor may denounce the defendant's wrongdoing. See *State v. Bissantz* (1982), 3 Ohio App.3d 108, 113, 3 OBR 123, 129, 444 N.E.2d 92, 98.

{¶ 123} The prosecutor described Edward Thompson as "one of the best witnesses any of us has seen in quite awhile." Appellant claims the prosecutor was improperly "vouching" for Thompson's credibility. However, the prosecutor's statement was not a voucher: it neither implied knowledge of facts outside the record nor placed the prosecutor's personal credibility in issue.

{¶ 124} The prosecutor's allegedly improper statement concerning Jones Pettus was not objected to, and any issue was therefore waived.

{¶ 125} Finally, the prosecutor stated that "we are left here with those witnesses given to us by this defendant," and the prosecution "would have loved to have put on" Wilkerson, Gullette, Abraham, and Cottrill as witnesses. We see nothing improper in this statement.

{¶ 126} Appellant further argues that the prosecutor introduced "victim impact" evidence in the guilt phase. This claim, which simply reargues appellant's eleventh proposition of law, was waived at trial, and lacks merit.

{¶ 127} Finally, appellant argues that the prosecutor made improper comments during penalty-phase closing arguments. As appellant did not object to any of the arguments to which he objects here, the issue is waived. None of the alleged errors amounted to plain error. Appellant is therefore not entitled to an adjudication on the merits of his arguments in this regard.

{¶ 128} In sum, appellant's fifteenth proposition of law is overruled.

IX

Ineffective Counsel

{¶ 129} In his nineteenth proposition of law, appellant claims that his trial counsel rendered ineffective assistance. To demonstrate ineffective assistance, an appellant must show that counsel's performance fell "below an objective standard of reasonable representation." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538

N.E.2d 373, paragraph two of the syllabus. He must also demonstrate prejudice—*i.e.*, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*, paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington* (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698.

{¶ 130} Appellant lists various objections he thinks his counsel should have made at trial. However, he fails to show that any of these omissions constituted ineffective assistance.

{¶ 131} Appellant argues that his counsel should have moved to dismiss Count Four, the felony-murder of Wilkerson, because the averment was worded in the alternative ("[aggravated] burglary and/or [aggravated] robbery"). However, failure to so move was nonprejudicial. Appellant was also charged with murdering Wilkerson under Count Three (prior calculation and design). Dismissal of Count Four would have left Count Three intact, and the panel ultimately found appellant guilty on that count. Thus, dismissal would have meant only that appellant would have been sentenced on Count Three instead of on Count Four.

{¶ 132} Appellant also argues that counsel should have requested the court not to consider Count Four in the penalty phase, because of the "and/or" language. However, by then—*after* Count Three had been merged into Count Four—it was too late to make such a request, which would have provoked justifiable charges of "sandbagging."

{¶ 133} Appellant's other claims also fail. It was not deficient for appellant's counsel to forgo a double jeopardy claim that was inconsistent with binding precedent. See, *e.g.*, *State v. Moss* (1982), 69 Ohio St.2d 515, 23 O.O.3d 447, 433 N.E.2d 181, *infra*. Nor was it deficient performance not to request Judge Brown's recusal just because he presided over the suppression hearing. See *State*

*v. Gillard* (1988), 40 Ohio St.3d 226, 229, 533 N.E.2d 272, 276; cf. *Withrow v. Larkin* (1975), 421 U.S. 35, 56, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712, 728-729.

{¶ 134} Declining to interrupt the prosecutor's argument with objections, or failing to object to certain evidence, was not deficient performance, especially in a bench trial. "A trial is not a law-school examination. * * * [N]o one will reward you for making every possible objection." McElhaney, Clutter (Mar.1991), 77 A.B.A.J. 73. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 43-44 and 52-53, 630 N.E.2d 339, 347 and 352-353; *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, 837. Nor do such failures undermine one's confidence in a verdict supported by extensive forensic evidence, eyewitness testimony, and appellant's videotaped confession.

{¶ 135} Failing to argue that the death penalty violates international law is not ineffective assistance, given the dearth of legal authority supporting that argument. (See discussion of twenty-fourth proposition of law, *infra*.)

{¶ 136} Appellant has shown neither deficient performance nor prejudice with respect to any of his ineffective-assistance allegations. Therefore, his nineteenth proposition of law is overruled.

X

Settled Issues

{¶ 137} In his twelfth proposition of law, appellant claims it is double jeopardy to sentence him for both felony-murder and the underlying felony, as the trial court did with respect to the Wilkerson, Gullette, and Abraham murders. However, felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony. See, *e.g.*, *State v. Moss* (1982), 69 Ohio St.2d 515, 520, 23 O.O.3d 447, 450, 433 N.E.2d 181, 186; *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 66, 10 OBR 352, 355-356, 461 N.E.2d 892, 895-896; *State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d 1237, 1242. That being the case, R.C. 2941.25 authorizes punishment for both crimes, and no double jeopardy violation

occurs. See *Moss* at 521-522, 23 O.O.3d at 451, 433 N.E.2d at 186-187, and paragraph one of the syllabus. Appellant's twelfth proposition of law is overruled.

{¶ 138} In his twenty-third proposition of law, appellant challenges the statutory definition of "reasonable doubt," R.C. 2901.05(D). We have previously rejected his position, *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604, and reject it again here.

{¶ 139} In his twenty-sixth proposition of law, appellant raises constitutional challenges to the Ohio death penalty statutes. We have repeatedly rejected each of appellant's arguments, and summarily overrule them here. We also overrule appellant's twentieth proposition of law, which reargues issues raised in his fourth and sixth propositions of law, *supra*.

{¶ 140} Appellant's twenty-fourth proposition of law raises questions of international law, which appellant did not raise at trial. They are thereby waived, and appellant's twenty-fourth proposition of law is overruled.

XI

Independent Sentence Review and Proportionality Analysis

{¶ 141} Having affirmed appellant's aggravated-murder convictions, we now must independently determine whether the evidence supports the aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt with respect to each murder, and whether the death sentences are proportionate to those affirmed in similar cases.

{¶ 142} After merger, Wilkerson's murder had three aggravating circumstances: course of conduct, aggravated robbery, and aggravated burglary. Cottrill's murder and Washington's murder each had three aggravating circumstances: course of conduct, kidnapping, and witness murder. Gullette's murder and Abraham's murder each had two aggravating circumstances: course of conduct and aggravated robbery.

{¶ 143} We find that the evidence supports each of these aggravating circumstances. All specifications were proven by appellant's confession, by strong physical evidence, and by the testimony of such eyewitnesses as Pettus, Thompson, Woodson, and Mathews.

{¶ 144} In weighing aggravation against mitigation, we note that the penalty for each aggravated murder must be assessed separately; the aggravating circumstances attached to a given count may be considered only with respect to that count. *Cooey*, paragraph three of the syllabus.

{¶ 145} Appellant was nineteen years old at the time of the murders and appears to have been relatively immature. His youth is entitled to some weight under R.C. 2929.04(B)(4).

{¶ 146} The trial court found that appellant lacked a significant history of criminal convictions or delinquency adjudications. This factor is entitled to weight under R.C. 2929.04(B)(5).

{¶ 147} Dr. Robert Smith, a psychologist, testified that appellant has a "passive-aggressive personality disorder." He also diagnosed appellant with post-traumatic stress disorder ("PTSD"). Smith believed that appellant could adjust well to prison with support and counseling. In the county jail, appellant had a good disciplinary record and socialized with other inmates.

{¶ 148} Under R.C. 2929.04(B)(3), a mitigating factor exists if "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Appellant claims his personality disorder and his PTSD qualify under this factor. We disagree. A personality disorder is not a "disease or defect." However, we accord this factor some weight, as the trial court did, under R.C. 2929.04(B)(7) (the catchall provision).

{¶ 149} With respect to Cottrill and Washington, appellant argues that R.C. 2929.04(B)(1) applies, "Whether the victim of the offense induced or facilitated it."

Appellant states that "there was evidence that both Wendy Cottrill and Marvin Washington were involved in criminal activities." Even if this was true, they were not involved in any of the crimes in this case. (They witnessed the shooting of Wright, but did not participate in that crime.) It is clear that Cottrill and Washington in no way "induced or facilitated" their own murders.

{¶ 150} Appellant did not play the role of a follower with respect to Wilkerson's murder. Even if Taylor suggested the robbery, appellant was the leader during the robbery and murder. He was the only one who brought a gun. He ordered Taylor and Mathews to tie Wilkerson up. It was appellant who decided to kill Wilkerson—Taylor and Mathews were not in the bedroom when he fired the first bullet at point-blank range into Wilkerson's heart. Appellant handed Taylor his gun to fire a second bullet. When that gun would not fire, appellant handed her another. When appellant, Taylor, and Mathews left, appellant drove the stolen car. He suggested taking the car to Detroit to sell it, and he told the others not to say anything to Cottrill and Washington.

{¶ 151} As for the other murders, it is true that appellant did not instigate them. He did not begin shooting in the mini-mart robbery until Smith did. Smith also suggested robbing Gullette. We accord these circumstances some mitigating weight. However, appellant overstates his case by claiming that he "was not the principal offender in most of the murders." He was in fact a principal, as we have defined that term—*i.e.*, the actual killer, not a mere accomplice—in four of the five murders.

{¶ 152} Appellant was born in 1973. On the day appellant's mother was released from the hospital after giving birth to him, appellant's father left home.

{¶ 153} Appellant's mother married three times. Her second husband, James Douglas, habitually abandoned the family, disappearing for months at a time. This upset appellant, who "had really gathered a love [for] Douglas." When appellant's mother finally divorced her second husband (after he had been gone for

a year), appellant was devastated. Her third husband drank to excess, gambled, and inflicted unspecified verbal and physical abuse on appellant's mother and her children.

{¶ 154} Appellant developed a close relationship with his older brother, Maurice. However, Maurice was shot to death in 1991. Appellant became depressed and withdrawn and began to fail academically, although his grades had been better before.

{¶ 155} After his brother was killed, appellant moved to California to live with his father. However, their relationship soured because appellant's father felt appellant was behaving irresponsibly. Appellant's father ultimately threw appellant out of his house.

{¶ 156} Appellant did display some remorse: he wept during his confession. Retrospective remorse, however, is entitled to little weight. Indeed, we are inclined to doubt the sincerity of appellant's remorse, which slumbered while he murdered five people in succession, and awoke only after his arrest.

{¶ 157} We find that several mitigating factors exist here, including appellant's youth, clean record, mental disorders, his remorse and confession, and the repeated, traumatic loss of father figures from his life.

{¶ 158} Yet, we are faced with a defendant who murdered five people in three days. The course of conduct specification is common to all five murders, and it has great weight with respect to each. And while his family life has been troubled, he has also had the advantage of a hardworking, churchgoing mother and family. His mental disorders are entitled to some weight, but they did not substantially diminish his capacity to understand the criminality of his actions or to choose between right and wrong.

{¶ 159} The aggravating circumstances are strongest with respect to the Cottrill-Washington murders. Murdering a witness to prevent his or her testimony strikes at the heart of the criminal justice system. Combined with the course of

conduct and the kidnapping, these crimes clearly merit the death penalty; beyond a reasonable doubt, the aggravation outweighs the mitigation presented by appellant.

{¶ 160} In the Wilkerson murder, the aggravating circumstances are aggravated burglary, aggravated robbery, and course of conduct. With respect to the two felony-murder factors, we find especially noteworthy the cynical deception by which appellant and his accomplices induced Wilkerson to allow them into his home. Moreover, the mitigating factors with respect to Wilkerson's murder are weaker, because appellant played the leading role in that crime. We find, beyond a reasonable doubt, that the aggravating circumstances attached to Wilkerson's murder outweigh the mitigating factors.

{¶ 161} Gullette's murder combined aggravated robbery with a course of conduct involving the murder of five people. In this case, we conclude that these two aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Finally, Abraham's murder has the same two aggravating circumstances as Gullette's. Again, we find beyond a reasonable doubt that aggravation outweighs mitigation.

{¶ 162} Moreover, the death penalty for the Wilkerson, Gullette, and Abraham murders is proportionate in comparison with death sentences we have affirmed in cases combining multiple-murder specifications with aggravated robbery and/or aggravated burglary specifications. See, *e.g.*, *State v. Gillard* (1997), 78 Ohio St.3d 548, 679 N.E.2d 276 (two victims); *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212 (nineteen-year-old defendant; two victims); *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227 (two victims); *State v. Montgomery* (1991), 61 Ohio St.3d 410, 419, 575 N.E.2d 167, 174 (two victims; twenty-year-old defendant with "violent and unstable family environment"); *State v. Dickerson* (1989), 45 Ohio St.3d 206, 543 N.E.2d 1250 (two victims; defendant proved diminished capacity).

**{¶ 163}** Also, the death penalty for the Cottrill-Washington murders is proportionate to *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304 (multiple murder and kidnapping). Indeed, we have frequently affirmed death sentences in cases where multiple murder was the sole death specification. See, *e.g.*, *State v. Williams* (1997), 79 Ohio St.3d 1, 679 N.E.2d 646; *State v. Kinley* (1995), 72 Ohio St.3d 491, 651 N.E.2d 419; *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294 (one victim; one intended victim).[4]

**{¶ 164}** Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

―――――――――――

4. This court did reject the death sentence in the multiple-murder case of *State v. Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451. However, in *Lawrence* there were only two murders, each aggravated murder count carried only one death specification, and the mitigating factors were far stronger.