[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This case is before us on the appeal of Willie A. Williams from his conviction on one count of aggravated murder and two counts of aggravated robbery, all with firearm specifications. Following a jury trial, Williams was sentenced to twenty years to life on the murder charge, and ten years to life on the other two counts, to be served consecutively. The firearm specifications were merged, with the three year sentence on that charge imposed consecutive to and prior to the indefinite term of imprisonment. In support of his appeal, Williams raises four assignments of error, all of which are without merit. Accordingly, we affirm the judgment of the trial court for the reasons that follow.
 I
The first assignment of error focuses on Williams' arrest, which was made without a warrant. In this context, Williams claims the arrest was illegal because it was not justified by exigent circumstances or by any other exception to the warrant requirement. The State's response is that the police had both probable cause and consent to enter the premises where Williams was arrested. We agree with the State.
Concerning the arrest, the facts are as follows. On the evening of October 29, 1996, three black males, Willie Williams, Damrick Taste, and Terrence Manning, painted their faces white, put on black skull caps, and stole a car, with the intent of robbing people. The men got the idea from a movie, "Dead President," in which young black males painted their faces white and shot and killed people during robberies. At around 2:15 a.m. on October 30, 1996, the three men tried to rob the occupants of a car on Linda Vista Avenue, in Dayton, Ohio. According to the testimony at trial, Williams walked up to the car with a Norinco assault rifle (resembling an AK47) and demanded money. When the driver, Forrest McKinney, started to drive away, Williams shot through the back window. The bullet entered McKinney's left shoulder, causing his death shortly thereafter. After being hit, McKinney continued to accelerate and his car hit two or three cars and a tree. The gunman then walked up to the wrecked car with the rifle but was scared away by a neighbor who had heard the crash. A passenger in the victim's car, Brandi Tschabrun, witnessed the robbery and was able eventually to identify both the driver of the robber's car and the shooter from photo spreads.
After the robbery, Williams, Taste, and Manning returned to Taste's mother's house and removed the makeup. Later that day, two witnesses heard Williams admit to having committed the homicide. The police were at the scene of the homicide almost immediately, as was a witness who lived on Linda Vista. However, the police made little progress in solving the murder until November 10, 1996, when the murder weapon was recovered during a traffic stop of Manning and Taste. Subsequently, Tschabrun identified Taste as the driver of the robber's car, and Taste implicated Williams as the shooter. Taste took the police to Williams' mother's (Brenda Collins') house and pointed it out as the location where the shooter lived. On November 12, 1996, the police also made contact with Faith Cunningham, one of the witnesses who had heard Williams say he was responsible for McKinney's murder.
Based on the above information, eight policemen went to Brenda Collin's house on November 12, 1996, at around 11:30 p.m. They did not have either an arrest or a search warrant. While the police surrounded the house, Mrs. Collins came out a side door. When the officers explained they were looking for Willie Williams, Mrs. Collins told them that Williams was her son. She also gave them consent to go inside the house. After the police were inside, they could not find Williams, and Mrs. Collins helped them look, stating, "He's in here. He couldn't have gotten out." As the officers prepared to do a more thorough search, Williams moved a trap door, came down from the attic, and surrendered to police. Subsequently, Williams gave the police a video-tape statement in which he admitted to the facts surrounding the robbery, but claimed that the gun had discharged accidentally.
Although a copy of the motion to suppress is not in the file, Williams apparently filed a motion to suppress on December 17, 1996. After hearing testimony from a detective about the investigation and the events leading up to Williams' arrest, as related above, the trial court denied the motion to suppress, finding that the police had probable cause and consent from Williams' mother.
Although the police may not enter a suspect's home absent a warrant or exigent circumstances, a warrantless entry or search can be made with the consent of an authorized occupant. Statev. Thompson (1987), 33 Ohio St.3d 1, 8, and State v.Greer (1988), 39 Ohio St.3d 236, 240. To justify a warrantless search on the basis of consent:
 [t]he state must demonstrate that the consent was freely and voluntarily given and not the result of coercion, express or implied. * * * Voluntariness is a question of fact to be determined from the totality of the circumstances. * * * The state's burden to prove consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority."
State v. Taylor (1991), 77 Ohio App.3d 223, 225-26 (citations omitted).
In the present case, no evidence was presented to indicate that Mrs. Collins' consent was not freely given. Although one might question how freely consent is given when one's home is surrounded by police, the only evidence before the trial court was that Mrs. Collins consented, and, in fact, actively helped the police look for her son. Furthermore, under the circumstances, the police clearly had probable cause for the arrest, i.e., "`a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.'"Atkinson v. Stop-N-Go Foods, Inc.(1992), 83 Ohio App.3d 132, 138. Not only did the police have the murder weapon, they had witnesses directly implicating Williams in the crime.
Based on the preceding discussion, the first assignment of error is overruled.
 II
In the second assignment of error, Williams claims he was selectively prosecuted by the State of Ohio. The basis for this argument is that Damrick Taste and Terrence Manning were not prosecuted for aggravated murder even though they vigorously participated in the planning and execution of the events of October 30, 1996. Instead, these two defendants were permitted to plead guilty to involuntary manslaughter. In response, the State makes two points. First, the State contends that Williams waived this issue by failing to raise it at trial. Second, the State claims that Williams has failed to establish a prima facie case of discriminatory prosecution. Again, we agree with the State.
At the outset, we note that this matter was not brought to the attention of the trial court, and was, therefore, waived. However, even if we considered this claim under the plain error doctrine, we do not believe the outcome of the trial would have been different but for the alleged error. State v. Engle (April 25, 1997), Montgomery App. No. 15293, unreported. In this regard, we stress that "`[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but [is] an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.'" State v. Keene
(1998), 81 Ohio St.3d 646, 650-51. The burden is on the defendant to prove the claim, and "the prosecutor is presumed not to have discriminated." Id. at 653. In order to establish a prima facie
case of discriminatory prosecution, the defendant has the burden of proving these essential elements:
 (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.
State v. Flynt (1980), 63 Ohio St.2d 132, 134-35.
In the present case, it is true that Williams was prosecuted for a more severe offense than his co-defendants. However, although all three men participated in the crime, Williams was clearly the most active participant, being the individual who actually attempted the robbery and shot the victim. Therefore, while the law can consider the culpability of all defendants equal, merely by virtue of their participation in a crime, the reality is that Williams was the most active participant and was not "similarly situated" to the other two defendants. Furthermore, frequently, co-defendants are offered a chance to plead guilty in exchange for testimony that helps convict a more culpable or more directly involved party. It is not selective enforcement for the State to proceed in this manner, unless some type of impermissible motive is involved. In this regard, Williams has failed to point to evidence of any impermissible motive or animus on the part of the State. Accordingly, we find neither error nor plain error in the fact that Williams' co-defendants were allowed to plead guilty to involuntary manslaughter. As a result, the second assignment of error is overruled.
 III
The third assignment of error is based on the trial court's alleged error in allowing the prosecutor to offer his opinion about Williams' guilt. In this regard, the law is clear that "[t]he prosecution is normally entitled to a certain degree of latitude in its concluding remarks." State v. Smith (1984),14 Ohio St.3d 13, 14 (citation omitted). The test for prosecutorial misconduct during closing arguments is "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." Id.
In the present case, the defense raises the following allegedly improper remarks, which were objected to during the prosecutor's closing argument:
 May it please the Court. * * * You know, it never ceases to amaze me.
Mr. Certo: Objection.
The Court: Sustained. Amazement is not an issue.
 Mr. Franceschelli: When we don't have the law, lawyers try to —
Mr. Certo: Objection.
The Court: Your basis?
Mr. Certo: That's the prosecutor's opinion.
The Court: Opinion is not important.
Mr. Certo: Pardon?
 The Court: Opinion is not important. Mr. Franceschelli, continue.
 Mr. Franceschelli: When you don't have the law, lawyers try to argue the facts. When you don't have the facts, they attempt to argue the law.
 Mr. Certo: Objection, Your Honor. This is supposed to be a summary of the facts of the case.
Mr. Franceschelli: This is argument.
 The Court: This is argument. You may argue within those realms.
 Mr. Franceschelli: When you don't have either, you raise issues that cloud your judgment as triers of fact to get you thinking about everything but the facts and the evidence in the courtroom.
In reviewing the transcript of the closing argument, we note the following other instances of apparent improper argument, which were objected to by defense counsel, but have not been raised on appeal. Specifically, the prosecutor commented as follows:
 Mr. Franceschelli: (referring to the defendant) I don't care if he is 19 years old. He's old enough to play with this. He's old enough to play with this and is old enough to cause the injury and damage and kill someone the way he did. If he is old enough to do that, he is old enough to pay the price now.
 And he's got street smarts. Don't let the lawyer fool you.
Mr. Certo: Objection.
The Court: Sustained.
Shortly thereafter, the following exchange occurred:
 But we've got more than that. As Miss Carper tells you, he acknowledges it in several different ways to two other people, and I don't care if it is Cunningham and she is a friend or girl friend of Manning. I don't care. I didn't pick these people. You didn't pick them. This defendant picked all the witnesses in this case when he hung around with Manning and Taste, and he picked Brandi Tschabrun. He picked Mr. McKinney. He picked all these people. I didn't pick them. I don't hang around with them. He did. I can't help it that he shot his mouth off and says in summary he is the guy who did it. If somebody else tells on me, I'm going to shoot them or kill them, too. Those are his words, not Brandi's. She didn't know he was going to say that to those other people. Brandi never knew that. What a coincidence. All the coincidences we have in this case. All the coincidences.
 And Mr. Manning, the co-defendant, I don't like him. I prosecuted him. He pled as charged, as indicted, to every specification. Nothing dismissed. And he was his witness. He might not like what Mr. Manning had to say on the stand, but Mr. Manning told you what happened, just like he told Detective Burke, and he went through what happened. And you know what? What a coincidence. He confirmed what Brandi said, that the defendant was the shooter, that the defendant was there, that the defendant chased him down the street with the other two in the car. Got out. Got out with the gun after the crash. He confirmed all that. What a coincidence. Brandi didn't know Mr. Manning was going to say that. Brandi didn't know these guys. What a coincidence.
 These are the facts. To believe otherwise and believe the big conspiracy theory is a smoke screen.
Mr. Certo: Objection.
The Court: Sustained.
 Mr. Franceschelli: It gets you nowhere. Please listen to the tape.
Not long ago, we disapproved of prosecutorial tactics that suggest defense counsel is using deception or trickery to get the jury to acquit the defendant. See, State v. Nobles (1995),106 Ohio App.3d 246, 270, and State v. Carpenter (1996),116 Ohio App.3d 615, 624 (criticizing prosecutorial remarks as "sophistry and pejorative ranting"). Once again, we see a situation in which the zeal to prevail has produced unwarranted aspersions on opposing counsel's honesty. In this particular case, the prosecutor's actions are difficult to comprehend, since the evidence of Williams' guilt was overwhelming — making the prosecutor's remarks something like using a cannon to swat a fly. Not only did Williams admit to participating in the homicide in front of two witnesses, he admitted the essential facts to the police in a videotape (while claiming the gun accidentally discharged). Both witnesses testified at trial and the videotape was played for the jury. Additionally, the surviving robbery victim positively identified Williams at trial, and a co-defendant, Manning, implicated Williams in the murder. The only evidence presented by Williams, in fact, was the damaging testimony of his co-defendant.
Faced with the state of the evidence, did the prosecutor need to cast slurs on opposing counsel's integrity? Obviously not. While we find the prosecutor's remarks improper, we cannot reverse the verdict, because it is clear "beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty." Smith, 14 Ohio St.3d at 15. We cannot find that the remarks prejudicially affected the substantial rights of the defendant.
Based on the foregoing discussion, the third assignment of error is without merit and is overruled.
 IV
In the fourth assignment of error, Williams contends that the trial court erred in failing to give a jury instruction on the lesser included offense of involuntary manslaughter. As an initial point, we note that the record is devoid of any indication that such an instruction was requested. No written instructions were filed, and the trial transcript does not reveal any discussion of the instructions or objections to the instructions. "Even when the claimed error is the failure to give an instruction concerning a lesser included offense, that error is governed by the plain error standard if there is no request that the instruction be given, and no objection to the trial court's failure to give that instruction." State v. Shaw (1990), 65 Ohio App.3d 821,827. Under the plain error standard, "[t]he failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." State v.Underwood (1983), 3 Ohio St.3d 12, syllabus.
As we mentioned above, the evidence of Williams' guilt was overwhelming. R.C. 2903.01(B) provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery or robbery." By comparison, the involuntary manslaughter statute in effect at the time provided that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a felony."
According to the evidence, Williams shot Forrest McKinney while trying to commit aggravated robbery. Williams' theory of the case was that he accidentally shot McKinney during the robbery. No proof supporting this theory was presented, other than Williams' videotape statement. Significant evidence negating such an accident was presented, including the plan of the three men to rob people as had been done in the "Dead Presidents'" movie; Williams' act of walking up to the victim's car a second time with the rifle; Williams' self-incriminating statements to others after the homicide; and the fact that the gun required four pounds of pressure on the trigger to be fired. Given the overwhelming evidence of the elements of aggravated murder, we do not believe that the outcome of the trial would have been different even if the trial court had given an instruction on involuntary manslaughter. Accordingly, the fourth assignment of error is without merit and is overruled.
Having found no merit in the assignments of error, we affirm the judgment of the trial court.
WOLFF, J., and YOUNG, J., concur.
Copies mailed to:
Karyn J. Lynn
David J. Fierst
Hon. John Petzold