[Cite as *State v. Westfall*, 2019-Ohio-4039.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 2018CA00166 |
| | : | |
| ALYSSA WESTFALL | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark County Court of
Common Pleas, Case No.
2018CR0353B

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: September 27, 2019

APPEARANCES:

For Plaintiff-Appellee: For Defendant-Appellant:

JOHN D. FERRERO, JR. EUGENE M. CAZANTES
STARK CO. PROSECUTOR 101 Central Plaza South, Ste. 1000
KATHLEEN O. TATARSKY Canton, OH 44702
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

*Delaney, J.*

{¶1}   Appellant Alyssa Westfall appeals from the December 7, 2018 Judgment Entry of the Stark County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2}   This case arose on January 11, 2018, when two men died of gunshot wounds in Monument Park.  Appellant, her boyfriend Justin Griffith, and their friend Ryan Geiger planned to rob a drug dealer of a pound of weed.  Appellant remained at the trio's apartment throughout the ensuing debacle, but she was instrumental in planning the attempted robbery that left two people dead.

*Appellee's bill of particulars*

{¶3}   Appellee's bill of particulars sets forth appellee's theory of the case:

> [Appellant and co-defendant Geiger] developed a plan to rob someone for a pound of marijuana in order to get money.  [Appellant] arranged the transaction with Nate Duncan, who along with others was supposed to be supplying the marijuana.  On January 11, 2018, [co-defendant Geiger] and Justin Griffith left their apartment to meet up with Duncan to rob him.  Both [appellant and co-defendant Geiger] were aware that Griffith had a firearm on his person when he left the apartment.  The original meet up was to take place at a different location inside the city, however, the sellers changed the location.  [Appellant] did maintain contact with both Griffith and Duncan from her apartment orchestrating the location of the meet.  Additionally, at the seller's request, [appellant] did transmit a photo as proof that

Griffith had money to purchase the drugs knowing that Griffith did not have sufficient money to purchase the drugs and that he intended to rob the sellers.

Based upon [appellant's] representations and facilitation of communications between Griffith and Duncan, Griffith and [co-defendant Geiger] met up with Duncan and Culver in Monument Park for the purpose of robbing Duncan and Culver for the drugs. During the commission of the robbery both Griffith and Culver drew guns and shot each other. Both sustained fatal gunshot wounds and died as a result.

Bill of Particulars, March 19, 2018.

*The evidence at trial*

{¶4} On January 11, 2018, around 9:37 p.m., Canton police received a ShotSpotter alert from the area of Monument Park. The ShotSpotter system is comprised of microphones throughout the city that pick up loud noises, including gunfire. If three microphones pick up gunfire, the location of the sound is triangulated and an alert goes out to the Canton Police Department. In the instant case, the ShotSpotter system recorded 2 gunshots at 9:37:10 p.m., and 5 gunshots at 9:37:15 p.m.

{¶5} In this case, Officers Slone, Eckelberry, and Marks were among the first to respond to the park. Slone established a perimeter on the well-traveled road running through the park. He observed a man lying on the ground on his side, just off the roadway. Officers rolled the man over and found a firearm in his left hand. The man was later identified as appellant's boyfriend, Justin Griffith. When the police came upon him, Griffith

was still alive but had sustained a gunshot wound to his chest. He was transported to Aultman Hospital and was deceased upon arrival.

{¶6} A short distance away, police stumbled upon the body of another individual who was already deceased. This man was identified as Tyrell Culver and he, too, had a firearm on his person. He had suffered multiple gunshot wounds.

{¶7} Both firearms were collected and secured. Upon investigation of the scene, no drugs or cash were found. Ultimately seven shell casings were found, one from each round fired. It was later determined that both firearms were operable. The firearm found near Culver had fired 4 rounds and the firearm found near Griffith had fired 3 rounds.

{¶8} Detective Terry Monter investigated the shootings and learned Griffith had been living in an apartment about 10 minutes away from the park. The apartment had doorbell-style cameras that fed information to Griffith's cell phone. Through his examination of videos from Griffith's cell phone (the "Ring videos"), Monter interviewed appellant and co-defendant Ryan Geiger.

*Appellant's recorded statement to investigators*

{¶9} Monter's interview of appellant on January 12, 2018 was recorded and played at trial as appellee's Exhibit 8. The interview was also transcribed for purposes of the record. The following information is adduced from appellant's Mirandized statement to Monter. Appellant was not in custody when she made the statement.

{¶10} Appellant and Justin Griffith were living together in the 900 block of Fulton Road Northwest, Canton. Appellant was pregnant with Griffith's child. Griffith's friend Geiger had been living with them in the apartment for a few weeks.

{¶11} Appellant, Griffith and Geiger discussed "hitting a lick" because they needed money "to be ready for the baby" and to save for a car. Appellant claimed she didn't think Griffith was serious "at first."

{¶12} To arrange a transaction, appellant admitted she reached out to an old friend of hers, Nate Duncan, via Facebook Messenger. She also spoke to Duncan on the phone (using Geiger's phone so Duncan would not have her number). Appellant asked Duncan for "a pound of weed" and the price discussed was $2,800. Appellant asked for a photo of the marijuana, which Duncan did not send. Duncan asked for a photo of the cash, and appellant sent one. Appellant said Griffith provided her with an "old" photo of cash because the pair did not actually have the amount discussed in the transaction.

{¶13} Duncan told appellant he was with his friend Tyrell [Culver], whom appellant did not know. Although they discussed a few possible locations, ultimately an agreement was reached for Duncan and Griffith to meet at Monument Park.

{¶14} Appellant remained behind in the apartment while Griffith went to make the transaction. Appellant said the last time she spoke to Griffith, he said Duncan arrived with a car full of people he didn't know.

{¶15} The parties had at first discussed meeting at a school, to make the targets of the robbery "feel comfortable." The location changed several times, however, with Griffith suggesting the park. Duncan messaged appellant when he was parked inside the park and asked where they were supposed to meet. Appellant gave him a number to call.

{¶16} Geiger later told appellant three people got out of the car with Duncan. Appellant was aware Griffith went to the meeting with a gun; Geiger was unarmed. Geiger told appellant that when Duncan and his group arrived, someone in the group wanted to

pat down Griffith and Geiger. Geiger consented but Griffith refused. Geiger told her that when guns were pulled, everyone ran. Geiger told appellant he took off running and he didn't know what happened to Griffith.

*The Ring videos*

{¶17} Appellee's Exhibit 12 is a disk of videos from the Ring cameras that went to Griffith's phone. The videos effectively illustrate planning for the robbery and appellant's participation therein, and the aftermath when Geiger returns to the apartment and announces that the robbery failed.

{¶18} In Exhibit 12E, appellant speaks to someone on the phone who can be heard in the video. She says that if the caller wants somewhere safe to meet, they can meet at a school near her residence because "there are cameras" in case anything bad were to happen. In Exhibits 12H and 12I, Geiger, Griffith, and appellant are visible. Appellant suggests Circle K as a location for the meeting but the parties argue. In 12K, appellant says someone has suggested Monument Park. 12L is Griffith and Geiger discussing the manner of the robbery and approach of the people arriving with the "weed." 12N shows the living room of the apartment. Someone bangs on the door and appellant runs to answer it. Outside the view of the camera, Geiger says "Justin got shot. That's why you hear all the sirens." 12O shows appellant sitting down on the bed with a cigarette as Geiger tells her the other group wanted to pat them down and he was fine with it, but Griffith refused. 12P shows appellant tracking Griffith's phone and realizing he is at the hospital.

*Indictment, jury trial, conviction and sentence*

{¶19} Appellant and co-defendant Geiger were each charged by indictment with one count of complicity to involuntary manslaughter pursuant to R.C. 2923.03(A)(2) and/or (A)(3) and R.C. 2903.04(A), a felony of the first degree [Count I], and one count of complicity to robbery pursuant to R.C. 2923.03(A)(2) and/or (A)(3) and R.C. 2911.02(A)(1), a felony of the second degree [Count II]. Both counts were accompanied by firearm specifications pursuant to R.C. 2941.141.

{¶20} Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence and renewed the motion at the close of all of the evidence; the motions were overruled. Appellant rested without presenting evidence. Appellant was found guilty as charged and the trial court sentenced her to an aggregate prison term of 14 years.

{¶21} Appellant now appeals from the judgment entries of conviction and sentence.

{¶22} Appellant raises five assignments of error:

**ASSIGNMENTS OF ERROR**

{¶23} "I. THE COURT COMMITTED PLAIN ERROR IN FAILING TO DECLARE A MISTRIAL AFTER THE CONTACT BETWEEN JUROR 19 AND APPELLANT, DEPRIVING APPELLANT OF HER CONSTITUTIONAL RIGHT TO BE TRIED BY A JURY."

{¶24} "II. THE TRIAL COURT ERRED IN FAILING TO MERGE THE ROBBERY AND INVOLUNTARY MANSLAUGHTER COUNTS FOR THE PURPOSE OF

SENTENCING SUBJECTING APPELLANT TO UNCONSTITUTIONAL DOUBLE JEOPARDY."

{¶25} "III. THE COURT VIOLATED APPELLANT'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT IN IMPOSING AN EXCESSIVE SENTENCE OF CONSECUTIVE TERMS TOTALING FOURTEEN YEARS' INCARCERATION."

{¶26} "IV.  THE COURT ERRED IN DENYING DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL AS THERE WAS NO EVIDENCE PRESENTED AS TO WHETHER THE PRINCIPAL OFFENDER ENGAGED IN ANY ACTIONS WHICH WOULD CONSTITUTE THE OFFENSE OF ROBBERY."

{¶27} "V.  THE JURY FUNDAMENTALLY LOST ITS WAY AND ENTERED VERDICTS CONTRARY TO LAW AS THE EVIDENCE AT TRIAL STRONGLY WEIGHED AGAINST APPELLANT'S GUILT."

**ANALYSIS**

I.

{¶28} In her first assignment of error, appellant argues the trial court should have declared a mistrial after she had contact with one of the jurors on the panel.  We disagree.

{¶29} After deliberations began, the courtroom bailiff advised the trial court that a juror spoke to appellant in the jurors' bathroom.  Juror 19 was brought in to the courtroom outside the presence of the rest of the jury, with the parties present.  Juror 19 said she was in the jurors' bathroom when she heard someone come in; she and the other person both left their stalls at the same time; the other person was appellant; both women washed their hands at the same time, and as they did so Juror 19 asked appellant what she named

her baby.  Appellant replied, "Braden, after his father," and asked if Juror 19 would like to see a picture of the child.  Juror 19 said "Sure."  Appellant showed her a photo and said the child "was her whole world."  Juror 19 responded that she had two children of her own and both women walked out of the bathroom.

{¶30} The trial court asked Juror 19 whether she was wearing her juror badge during this conversation and she said yes.  Juror 19 stated she did not tell anyone else about the conversation, including any other juror.  The trial court asked appellant why she spoke to Juror 19 and appellant said she didn't realize she was in the jurors' bathroom, nor that the woman was a juror on her case.

{¶31} The trial court advised Juror 19 she would be removed and replaced with an alternate juror.  The parties agreed to the removal of Juror 19 and to replacement with Juror 44.  Neither party objected nor moved for a mistrial.

{¶32} The trial court stated Juror 19 would be replaced with Juror 44 and that the rest of the panel would be questioned whether they had contact with anyone involved in the case.  T. III, 10-11.  Any such inquiry does not appear in the record, and there is no further reference to the incident on the record.

{¶33} In her first assignment of error, appellant argues that the trial court intimated to the entire jury that she had improper contact with Juror 19, resulting in a quick period of deliberation and two guilty verdicts.  Appellant states, "By telling the jury that Juror 19 was being removed then questioning the remaining jurors on whether they had been contacted by anyone involved in the case, the Court intimated to the jury that Appellant contacted Juror 19."  Brief, 4-5.  We find that this assertion, and the resulting conclusion,

are not supported by the record. We will not speculate by what means the trial court explained the removal and replacement of Juror 19.

{¶34} Appellant further argues that the trial court should have granted a mistrial, citing R.C. 2945.33. That section states:

> When a cause is finally submitted the jurors must be kept together in a convenient place under the charge of an officer until they agree upon a verdict, or are discharged by the court. The court, except in cases where the offense charged may be punishable by death, may permit the jurors to separate during the adjournment of court overnight, under proper cautions, or under supervision of an officer. Such officer shall not permit a communication to be made to them, nor make any himself except to ask if they have agreed upon a verdict, unless he does so by order of the court. Such officer shall not communicate to any person, before the verdict is delivered, any matter in relation to their deliberation. Upon the trial of any prosecution for misdemeanor, the court may permit the jury to separate during their deliberation, or upon adjournment of the court overnight.
>
> * * * *.

{¶35} The section cited by appellant does not entitled her to a mistrial solely due to improper communication with a juror. Ordinarily, any private communication or contact either directly or indirectly about a matter before the jury is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), syllabus. The

presumption is not conclusive, however. *Id.* It is incumbent upon the party complaining about juror misconduct to demonstrate that the contact was prejudicial. *Smith v. Phillips*, 455 U.S. 209, 215–217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); see, also, *State v. Sheppard*, 84 Ohio St.3d 230, 233, 703 N.E.2d 286 (1998); *State v. Phillips*, 74 Ohio St.3d 72, 88, 656 N.E.2d 643 (1995). Absent prejudice, there is no violation of due process. *Smith v. Phillips,* supra, 455 U.S. at 217.

{¶36} We note appellant and her counsel were present when the trial court discussed the replacement of Juror 19 with an alternate juror; no objection was raised and defense trial counsel agreed to the replacement.  The trial court was authorized to replace Juror 19 with an alternate.  R.C. 2945.29 states that "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be designated to take the place of the juror so discharged." Likewise, Crim.R. 24(G)(1) provides for the use of alternate jurors if regular jurors "become or are found to be unable or disqualified to perform their duties."

{¶37} Whether a juror is unable to perform his duty is a determination that lies within the trial court's discretion. *State v. Reid*, 2nd Dist. Montgomery No. 19352, 2003-Ohio-4087, ¶ 14, citing *State v. Kish,* 9th Dist. Lorain No. 02CA008146, 2003-Ohio-2426*,* ¶ 6 and *State v. Tate*, 2nd Dist. Clark No. 2431, 1989 WL 20301 (Mar. 7, 1989). In cases involving outside influences on jurors, the trial court is granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. *State v. Johnson,* 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054.  In *Johnson*, supra, 88 Ohio St.3d at 107, the Ohio Supreme Court re-examined the procedure and

applicable law a court must follow when an allegation is made that an improper communication has occurred with a juror, citing its decision in *State v. Phillips*, 74 Ohio St.3d 72, 88-89, 656 N.E.2d 643 (1995):

> When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror. *Smith v. Phillips*, 455 U.S. 209, 215–216, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Remmer v. United States*, 347 U.S. 227, 229–230, 74 S.Ct. 450, 98 L.Ed. 654 (1954). 'In a criminal case, any private communication * * * with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial * * *. [T]he burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.' *Id.* The Sixth Circuit, however, has held that the defense must prove that the juror has been biased. *United States v. Zelinka*, 862 F.2d 92, 95 (C.A.6, 1988), citing *Smith v. Phillips, supra*; contra *United States v. Littlefield*, 752 F.2d 1429, 1431 (C.A.9, 1985). In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. See *United States v. Daniels*, 528 F.2d 705, 709–710 (C.A.6, 1976); *United States v. Williams*, 822 F.2d 1174, 1189 (C.A.D.C.1987).

{¶38} In the instant case, the trial court held the requisite hearing with Juror 19 with the parties present, establishing what happened between Juror 19 and appellant. The parties consented to the trial court's replacement of Juror 19 and no objection was raised. We find the trial court did not abuse its discretion in replacing Juror 19, and appellant has not presented us with any authority contra.

{¶39} We also note that appellant did not object to this procedure, nor did she move for a mistrial. Appellant does not explicitly invoke the plain-error rule, but pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The rule places several limitations on a reviewing court's determination to correct an error despite the absence of timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes "an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn*, 5th Dist. No. 2008-CA-00137, 2009-Ohio-1688, citing *State v. Morales*, 10 Dist. Nos. 03-AP-318, 03-AP-319, 2004-Ohio-3391, at ¶ 19 (citation omitted). The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes*, supra, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶40} Appellee responds that the process of replacing Juror 19 with Juror 44 does not rise to the level of plain error and we agree. In addition to appellant's consent to the replacement, she has not demonstrated material prejudice or that the result of the trial

would have been different.     In fact, as appellee points out, defense trial counsel may have made a strategic decision to agree to the substitution of Juror 44 because that juror was not tainted by the improper contact with appellant.

{¶41} Even if there was an ex parte, off-the-record communication between the trial court and the rest of the jury, which we are not willing to speculate upon, such private communication outside the presence of the defendant does not create a conclusive presumption of prejudice. *State v. Schiebel*, 55 Ohio St.3d 71, 84, 564 N.E.2d 54, 69 (1990), citing *Remmer v. United States, supra,* 347 U.S. at 229 and *State v. Jenkins*, 15 Ohio St.3d 164, 236–237, 473 N.E.2d 264 (1984).

{¶42} We conclude the trial court did not abuse its discretion in replacing Juror 19 with Juror 44.  Moreover, the process of substituting the alternate juror does not rise to plain error.  Appellant's first assignment of error is overruled.

II.

{¶43} In her second assignment of error, appellant argues the trial court should have merged the counts of robbery and involuntary manslaughter for purposes of sentencing.  We disagree.

{¶44} A defendant may be indicted upon and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. *State v. Carr*, 2016-Ohio-9, 57 N.E.3d 262, ¶ 42 (5th Dist.), citing *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 42. At sentencing, appellant argued her convictions upon one count of complicity to involuntary manslaughter and one count of complicity to robbery, along with the accompanying gun specifications, should merge. In response, appellee submitted the statement of co-defendant Geiger, arguing that the robbery was motivated

by a separate animus than the involuntary manslaughter. The trial court agreed and found that the offenses did not merge.

{¶45} R.C. 2941.25 states as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶46} The question of whether offenses merge for sentencing depends upon the subjective facts of the case in addition to the elements of the offenses charged. *State v. Hughes*, 5th Dist. Coshocton No. 15CA0008, 2016-Ohio-880, 60 N.E.3d 765, ¶ 21. In a plurality opinion, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. *Id.* at ¶ 48. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. *Id.* at ¶ 49. If the answer to the above two questions is

yes, then the offenses are allied offenses of similar import and will be merged. *Id.* at ¶ 50. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge. *Id.* at ¶ 51.

{¶47} *Johnson's* rationale has been described by the Court as "incomplete." *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 11. The Court has further instructed us to ask three questions when a defendant's conduct supports multiple offenses: (1) were the offenses dissimilar in import or significance? (2) were they committed separately? and (3) were they committed with separate animus or motivation? *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. An affirmative answer to any of the above will permit separate convictions. *Id.* The conduct, the animus, and the import must all be considered. *Id.*

{¶48} Appellate review of an allied-offense question is *de novo. State v. Miku*, 2018-Ohio-1584, 111 N.E.3d 558, ¶ 70 (5th Dist.), citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12.

{¶49} Appellant contends that the consecutive terms should have merged for purposes of sentencing because they are allied offenses of similar import, involving the same conduct and the same animus. R.C. 2903.04, the involuntary manslaughter statute, provides: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2911.02, the robbery statute, states in pertinent part: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or

offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control."

{¶50} Involuntary manslaughter and robbery are not allied offenses of similar import. The former requires causing the death of another as a proximate result of committing or attempting to commit a felony; robbery does not require that the victim be killed or even injured. As appellee points out, robbery under this section is complete when an offender attempts to commit a theft offense and has a deadly weapon on his person or under his control. Robbery requires a theft offense or an attempt to commit one; involuntary manslaughter does not, and robbery is only one of the many felonies that may support a charge of involuntary manslaughter. Because each offense requires proof of an element that the other does not, they are not allied offenses of similar import. Therefore, reviewed in the abstract, involuntary manslaughter and robbery are not allied offenses because the commission of one will not automatically result in commission of the other.

{¶51} As we will address in greater detail infra in our discussion of her fourth and fifth assignments of error, the evidence established appellant was complicit with Griffith and Geiger in planning to "hit a lick" on a drug dealer. On video, appellant talks to Nate Duncan and arranges a purchase of marijuana in the amount of $2800. She admitted to investigators that she sent Duncan a photo of cash to "prove" that Griffith had the amount required to buy the marijuana. Griffith appears throughout the videos, carrying the firearm, racking and loading it. The location of the "buy" is discussed and changed; the intended location is Monument Park.

{¶52} The ensuing events are related by co-defendant Geiger, also captured on video. Geiger said one of the people in Duncan's group wanted to pat down Geiger and Griffith; Griffith refused and drew his firearm. The ShotSpotter records, firearms, and shell casings established that Griffith fired two shots, followed by one shot, answered by four shots fired by Culver. Pursuant to *Ruff,* we conclude that the offenses are dissimilar in import and significance, were they committed separately, and were committed with separate motivations. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

{¶53} The trial court did not err in refusing to merge the offenses, as they are not allied offenses of similar import. Appellant's second assignment of error is overruled.

III.

{¶54} In her third assignment of error, appellant argues the trial court's consecutive aggregate sentence of 14 years constitutes cruel and unusual punishment. We disagree.

{¶55} "[A]ppellate courts must adhere to the plain language of R.C. 2953.08(G)(2)." *State v. Marcum,* 146 Ohio St.3d 516, 2016–Ohio–1002, 59 N.E.3d 1231, ¶ 7. An appellate court may only modify or vacate a sentence if it finds by clear and convincing evidence that the record does not support the sentencing court's decision. *Id.* at ¶ 23. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *State v. Silknitter,* 3rd Dist. Union No. 14–16–07, 2017–Ohio–327, ¶ 7, citing *Marcum, supra.* Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but does not require the certainty of "beyond a

reasonable doubt." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶56} In the instant case, appellant argues the trial court erred in imposing an "excessive" consecutive sentence. We note appellant does not argue that the trial court failed to make the proper findings; instead, she disagrees with the weight afforded to those findings. "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 16 N.E.3d 659, 2014-Ohio-3177, syllabus.

{¶57} In Ohio, there is a statutory presumption in favor of concurrent sentences for most felony offenses. R.C. 2929.41(A). The trial court may overcome this presumption by making the statutory, enumerated findings set forth in R.C. 2929.14(C)(4). *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 23. This statute requires the trial court to undertake a three-part analysis. *State v. Alexander,* 1st Dist. Hamilton Nos. C–110828 and C–110829, 2012-Ohio-3349, 2012 WL 3055158, ¶ 15.

{¶58} R.C. 2929.14(C)(4) concerns the imposition of consecutive sentences and provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are

not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶59} Thus, in order for a trial court to impose consecutive sentences the court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. The court must also find that consecutive sentences are not disproportionate to the offender's conduct and to the danger the offender poses to the public. Finally, the court must make at least one of three additional findings, which include that (a) the offender committed one or more of the offenses while awaiting trial or

sentencing, while under a sanction imposed under R.C. 2929.16, 2929.17, or 2929.18, or while under post release control for a prior offense; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of the offender's conduct; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *See, State v. White*, 5th Dist. Perry No. 12-CA-00018, 2013-Ohio-2058, ¶ 36.

{¶60} In this case, the record does establish that the trial court made all of the findings required by R.C. 2929.14(C)(4) at the time it imposed consecutive sentences. Appellant disagrees with the import of those findings, however, claiming she is less culpable because she was not present when the robbery and involuntary manslaughter occurred at Monument Park; she acted under Griffith's influence; and Culver was engaged in criminal wrongdoing when he was shot. We do not find these arguments compelling and note that in formulating her sentence, the trial court repeatedly referred to appellant's total lack of remorse and minimizing of her role in this incident that left two dead. The evidence before us, particularly the videos of appellant nonchalantly planning, encouraging, inciting, and fully participating in the plan to rob someone, fully supports the trial court's findings and refutes appellant's claims here.

{¶61} We also note that in the sentencing entry, the trial court found that consecutive sentences are necessary to protect the public from future crime or to punish the offender; are not disproportionate to appellant's conduct and to the danger she poses to the public; and at least two of the multiple offenses were committed as part of one or

more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of appellant's conduct.

{¶62} Based on our review, we find that the record demonstrates that the trial court made the seriousness findings pursuant to R.C. 2929.12(B) and (C). Here, the trial court's sentence was within the statutory range. Moreover, the record reveals that the trial court properly considered the statutory purposes and factors of felony sentencing, and the decision is supported by clear and convincing evidence. Accordingly, we find that the trial court did not err in the imposition of appellant's prison sentence, including imposition of consecutive terms, and did not fail to consider the statutory factors.

{¶63} Appellant's third assignment of error is overruled.

IV., V.

{¶64} Appellant's fourth and fifth assignments of error are related and will be considered together. Appellant argues her convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶65} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶66} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶67} Appellant was found guilty upon one count of complicity to commit robbery pursuant to R.C. 2911.02(A)(1), which states: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control." Appellant was also found guilty upon one count of complicity to commit involuntary manslaughter pursuant to R.C. 2903.04(A), which states: "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."  The relevant portion of the complicity statute, R.C. 2923.03(A)(2) and (A)(3), states:  "No person, acting with the kind of culpability required for the commission of an offense, shall (2) [a]id or abet another in committing the offense; [and/or] (3)

[c]onspire with another to commit the offense in violation of section 2923.01 of the Revised Code." Appellant argues there is no evidence to establish what occurred in Monument Park, including no evidence to establish Griffith engaged in a theft offense or attempted to commit a theft offense against Culver; consequently, there is no evidence to establish that appellant aided, abetted, or conspired with Griffith to do so.

{¶68} We have recognized that in order to support a conviction for complicity by aiding or abetting under R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal, and such intent may be inferred from the circumstances surrounding the crime. *State v. Umstead*, 5th Dist. No. 16 CA 004, 2017-Ohio-698, 85 N.E.3d 518, ¶ 19, citing *State v. Shrider,* 5th Dist. Licking No. 07 CA 111, 2008-Ohio-3648, 2008 WL 2840598, ¶ 41, internal citation omitted. Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not aiding or abetting. *Id.,* citing *State v. Mullins*, 34 Ohio App.3d 192, 200, 517 N.E.2d 945 (5th Dist.1986).

{¶69} In the instant case, we find appellee presented sufficient evidence to support appellant's conviction upon complicity to commit robbery; specifically, we cite the compelling evidence of the Ring videos. Appellant is on the videos literally supporting, encouraging, assisting, advising, and inciting the robbery of a drug dealer, who happened to be Nate Duncan, and the people Duncan brought with him, including Tyrell Culver. Appellant admitted she, Griffith, and Geiger planned to rob a drug dealer for money. Equally evident on the video is that Griffith went to the meeting with a firearm, and appellant was fully complicit in that decision.

{¶70} Appellant argues there is no evidence to establish what happened in the park. Pursuant to R.C. 2011.02(A)(1), appellee only needed to prove that the defendant attempted to commit a theft, having a deadly weapon under his control. We find the record is replete with evidence that Griffith attempted to commit a theft, armed with a deadly weapon, and that appellant was fully complicit in those actions. The record is not devoid of evidence of what transpired in the park: the ShotSpotter tells the story of the first volley of shots and its aftermath, leaving behind two dead as the others ran away. Culver and Griffith fell with their firearms at their sides, Culver having fired 4 rounds and Griffith having fired 3 rounds. Meanwhile, Geiger pounds on the door back at the residence, telling appellant Griffith may have been shot, and she soon realizes he is at the hospital. Geiger tells her the Duncan group showed up and Griffith was unwilling to be patted down, leading to the ensuing chaos of gunfire.

{¶71} Construing all of the evidence in favor of appellee, sufficient evidence supports appellant's convictions. Also, this is not the case in which the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be overturned and a new trial ordered. Appellant's convictions are not against the manifest weight of the evidence.

{¶72} Appellant's fourth and fifth assignments of error are overruled.

## CONCLUSION

{¶73} Appellant's five assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.

By:  Delaney, J., and

Gwin, P.J., concur.

Hoffman, J., concurring separately.

*, concurring*

**{¶74}** I concur in the majority's analysis and disposition of Appellant's first, third, fourth and fifth assignments of error.

**{¶75}** I further concur in the majority's disposition of Appellant's second assignment of error. I write separately to clarify what I believe is the proper focus when analyzing whether offenses are allied.

**{¶76}** The majority concludes involuntary manslaughter and robbery are not allied offenses of similar import because the former requires causing the death of another as a proximate result of committing or attempting to commit a felony; robbery does not require the victim be killed or even injured. (Maj. Op. at ¶50). While this is true, the majority focuses on a comparison of the elements of the two offense and not on the defendant's conduct.

**{¶77}** The majority later reiterates because each offense required proof of an element the other does not, they are not allied offenses of similar import, because the commission of one will not automatically result in the commission of the other. (Maj. Op. at ¶50). Again the majority's focus seemingly is based upon an analysis of the elements of the two charges rather than the defendant's conduct.

**{¶78}** I am not convinced involuntary manslaughter and robbery can never be allied offenses. I think it is hypothetically possible to commit both robbery and involuntary manslaughter by the same conduct.

**{¶79}** For example, if a victim suffers a heart attack as a result of a defendant brandishing a gun during a robbery, I suggest the defendant's same conduct may result in the commission of both offenses. See *State v. Kerby*, 2nd Dist. Clark No. 2013 CA 31, 2014-Ohio-3358, ¶13, ("[I]t is possible to commit involuntary manslaughter under R.C.

2903.04(A) and aggravated robbery under R.C. 2911.01(A)(1) with the same conduct, thus satisfying the first prong of the *Johnson* test.")

**{¶80}**  However, I do agree under the facts of this case the offenses were not allied. As noted by the majority, the robbery was arguably completed when Appellant attempted the theft offense while in possession of a gun.  The robbery was motivated by a separate animus from the involuntary manslaughter and the offenses were committed separately under the facts of this case.  And there was a separate, distinct harm (death) caused by the gunfire from that of the robbery.

**{¶81}** Accordingly, I concur in the majority's decision to overrule Appellant's second assignment of error.

_____

HON. WILLIAM B. HOFFMAN