[Cite as *State v. Geiger*, 2019-Ohio-4338.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| RYAN CORDALE GEIGER | : | Case No. 2018CA00173 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:             Appeal from the Court of Common
                                     Pleas, Case No. 2018CR0353(A)


JUDGMENT:                            Affirmed


DATE OF JUDGMENT:                    October 21, 2019


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

JOHN D. FERRERO                       BERNARD L. HUNT
PROSECUTING ATTORNEY                  2395 McGinty Road NW
STARK COUNTY, OHIO                    North Canton, OH 44720

By: KATHLEEN O. TATARSKY
    110 Central Plaza, South – Suite 510
    Canton, OH 44702

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant Ryan Cordale Geiger appeals the September 13, 2018 judgment of conviction and sentence of the Court of Common Pleas of Stark County, Ohio. Plaintiff-Appellee is the state of Ohio.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   The City of Canton employs a system called "ShotSpotter." ShotSpotter utilizes microphones located throughout the city to detect loud noises such as gunfire. On January 11, 2018, Canton City Police Officer John Eckelberry was working the afternoon shift and was assigned to respond to any ShotSpotter calls.

{¶ 3}   At 9:37 pm, a ShotSpotter microphone at Monument Park reported a total of seven shots fired, the first two fired five seconds before the last five. The system indicated the shots were fired from two different weapons. Eckleberry and his partner Officer Kyle Slone responded to Monument Park where they discovered a white male, later identified as Justin Griffith, lying just off the road. Griffith was gasping for air and had a through and through gunshot wound to his side. Eckleberry rolled Griffith over to render aid and discovered a loaded Smith and Wesson nine millimeter firearm in Griffith's left hand. Eckleberry seized the weapon, rendered it safe and placed it in his cruiser.

{¶ 4}   Additional officers arrived on the scene to assist. Near the towpath trail in the park, Officer Timothy Marks located a deceased black male later identified as Tyrell Culver. Culver had also been shot. A Century Arms nine millimeter weapon was found in his hand.

{¶ 5}   No drugs or money were found on either body.

{¶ 6}   Griffith was transported to Aultman Hospital where he was pronounced dead.

{¶ 7}   Canton Police Detective Jeff Weller responded to the scene to investigate the deaths. No shell casings were discovered near Griffith, however, seven shell casings were discovered by Culver's body. Four were fired from the Century Arms weapon found in Culver's hand, and three were fired from the Smith and Wesson found in Griffith's hand. The weapons were later tested and confirmed operable.

{¶ 8}   Detectives obtained a warrant to view content on a cell phone found on Griffith's body. The phone contained several Ring security camera videos that went to Griffith's phone from inside his apartment. Video was sent to the phone both before and after the shootings. The videos showed Geiger, Griffith, and Griffith's girlfriend Alyssa Westfall inside the apartment. Westfall was on the phone setting up a drug deal with Nathan Duncan to purchase a pound of marijuana for $3000. None of the three had $3000. Instead, the plan was for Griffith and Geiger to rob Turner of the marijuana and resell it. Griffith was to pull the gun on Duncan and Geiger was to be the lookout. Griffith is shown getting dressed, loading a firearm and walking around the apartment with the firearm in his hand. At the end of the video, Geiger declares they are ready.

{¶ 9}   Additional video following the failed robbery attempt shows Geiger's return to the apartment and his explanation to Westfall. He told Westfall the robbery failed because when Duncan arrived with two other people, they wanted to pat Geiger and Griffith down for weapons.  Geiger consented, but Griffith refused. Then both Culver and Griffith pulled out firearms.  Geiger told Westfall he ran and did not know what happened

to Griffith. Westfall used an app on her iPhone to locate Griffith's phone. The app indicated the phone was at Aultman Hospital. Geiger and Westfall then left for Aultman Hospital.

{¶ 10} Further investigation revealed five individuals were present at Monument Park: Geiger and Griffith, who were attempting to rob Nathan Duncan, Joshua Carpenter, and Tyrell Culver of the marijuana they had intended to sell.

{¶ 11} Detectives located Geiger and interviewed him at the police station on January 12, 2018. After receiving his Miranda warnings and waiving the same, Geiger told detectives of planning for the robbery, and described what happened at Monument Park. He indicated Culver pulled out a firearm first, but he was unsure who had fired the first shot.

{¶ 12} On March 6, 2018, the Stark County Grand Jury returned an indictment charging Geiger with one count of complicity to commit involuntary manslaughter, a felony of the first degree, and one count of complicity to commit robbery, a felony of the second degree. Each count contained a firearm specification. Westfall was identically indicted.

{¶ 13} Geiger pled not guilty to the charges. On April 13, 2018, Geiger filed a motion to dismiss the indictment alleging selective prosecution. On August 21, 2018, the trial court denied the motion.

{¶ 14} Geiger's jury trial began on August 28, 2018. The parties entered into two stipulations. First the parties agreed that based upon Culver's autopsy, his gunshot wound was not self-inflicted, but rather Culver's death was a homicide. Second, the parties agreed that both Nathan Duncan and Joshua Carpenter were present a Monument Park on January 11, 2018 and that Duncan was the individual coordinating with Westfall.

{¶ 15} After hearing all the evidence and deliberating, the jury found Geiger guilty as charged. The trial court found the charges were not allied offenses. Geiger was subsequently sentenced to nine years for complicity to involuntary manslaughter and four years for complicity to robbery. The trial court found the firearm specifications did merge and imposed an additional year for the specification. Geiger's total sentence was 14 years.

{¶ 16} Appellant filed an appeal and the matter is now before this court for consideration. He raises three assignments of error as follow:

I

{¶ 17} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT FAILED TO MERGE THE MULTIPLE COUNTS OF ROBBERY AND INVOLUNTARY MANSLAUGHTER AS ALLIED OFFENSES OF SIMILAR IMPORT, IN VIOLATION OF O.R.C. 2941.25(A)."

II

{¶ 18} "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO DISMISS."

III

{¶ 19} "THE APPELLANT WAS DENIED HIS AFFECTIVE ASSISTANCE OF COUNSEL."

I

{¶ 20} In his first assignment of error, Geiger argues the trial court erred in failing to merge the charges of complicity to robbery and complicity to involuntary manslaughter as allied offenses of similar import. We disagree.

{¶ 21} R.C. 2941.25 governs multiple counts and states the following:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 22} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, syllabus, the Supreme Court of Ohio held the following:

1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.

2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

{¶ 23} The Ruff court explained at paragraph 26:

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

{¶ 24} In co-defendant Westfall's appeal, we found Westfall's identical convictions did not merge. We explained:

Appellant contends that the consecutive terms should have merged for purposes of sentencing because they are allied offenses of similar import, involving the same conduct and the same animus. R.C. 2903.04, the involuntary manslaughter statute, provides: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2911.02, the robbery statute, states in pertinent part: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control."

Involuntary manslaughter and robbery are not allied offenses of similar import. The former requires causing the death of another as a proximate result of committing or attempting to commit a felony; robbery does not require that the victim be killed or even injured. As appellee points out, robbery under this section is complete when an offender attempts to commit a theft offense and has a deadly weapon on his person or under his control.

Robbery requires a theft offense or an attempt to commit one; involuntary manslaughter does not, and robbery is only one of the many felonies that may support a charge of involuntary manslaughter. Because each offense requires proof of an element that the other does not, they are not allied offenses of similar import. Therefore, reviewed in the abstract, involuntary manslaughter and robbery are not allied offenses because the commission of one will not automatically result in commission of the other.

As we will address in greater detail infra in our discussion of her fourth and fifth assignments of error, the evidence established appellant was complicit with Griffith and Geiger in planning to "hit a lick" on a drug dealer. On video, appellant talks to Nate Duncan and arranges a purchase of marijuana in the amount of $2800. She admitted to investigators that she sent Duncan a photo of cash to "prove" that Griffith had the amount required to buy the marijuana. Griffith appears throughout the videos, carrying the firearm, racking and loading it. The location of the "buy" is discussed and changed; the intended location is Monument Park.

The ensuing events are related by co-defendant Geiger, also captured on video. Geiger said one of the people in Duncan's group

wanted to pat down Geiger and Griffith; Griffith refused and drew his firearm. The ShotSpotter records, firearms, and shell casings established that Griffith fired two shots, followed by one shot, answered by four shots fired by Culver. Pursuant to *Ruff*, we conclude that the offenses are dissimilar in import and significance, were they committed separately, and were committed with separate motivations. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

{¶ 25} *State v. Westfall*, 5th Dist. Stark No. 2018CA00166, 2019-Ohio-4039 ¶ 49-52.

{¶ 26} We find here as we did in *Westfall*. The trial court did not err in refusing to merge the offenses as they are not allied offenses of similar import. Geiger's first assignment of error is overruled.

II

{¶ 27} Geiger next argues the trial court erred when it refused to dismiss the indictment based on selective prosecution. We disagree.

{¶ 28} Geiger argues selective prosecution based on the fact that Nathan Duncan and Joshua Carpenter were not charged in this matter. In *State v. Flynt*, 63 Ohio St.2d 132, 407 N.E.2d 15 (1980), the Ohio Supreme Court addressed the elements Geiger must meet to establish his selective-prosecution claim:

To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution and (2) that the government's discriminatory selection of him for prosecution, has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as intentional and purposeful discrimination.

{¶ 29} *Id.*, at 134 quoting *United States v. Berrios* 501 F.2d 1207, 1211, (C.A.2, 1974).

{¶ 30} Additionally, a mere showing another person similarly situated was not prosecuted is not enough. A defendant must demonstrate actual discrimination due to invidious motives or bad faith. *State v. Freemman*, 20 Ohio St.3d 55, 58, 485 N.E.2d 1043 (1985). The prosecutor enjoys a presumption his or her actions were non-discriminatory in nature. *State v. Keen*, 81 Ohio St.3d 646, 653, 693 N.E.2d 246 (1998).

{¶ 31} As noted by appellee, although Duncan and Carpenter were present at Monument Park on the day in question, there is no evidence in the record to support a conclusion that they committed or were complicit to a robbery which led to involuntary manslaughter. Moreover, Westfall was indicted for the same crimes as Geiger. Geiger is

unable, therefore to meet either of the two prongs set forth in *Flynt* to establish selective prosecution.

{¶ 32} The second assignment of error is overruled.

III

{¶ 33} In his final assignment of error, Geiger argues he was denied effective assistance of counsel. We disagree.

{¶ 34} The standard this issue must be measured against is set out in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.  Appellant must establish the following:

> 2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.  (State v. Lytle [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; Strickland v. Washington [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)

> 3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.

{¶ 35} This court must accord deference to defense counsel's strategic choices made during trial and "requires us to eliminate the distorting effect of hindsight." *State v. Post,* 32 Ohio St.3d 380, 388, 513 N.E.2d 754 (1987).

{¶ 36} Geiger makes several arguments under this assignment of error. He first argues he was denied effective assistance of counsel during voir dire, accusing his counsel of using incorrect legal definitions and drawing an objection for the same from counsel for the state. Geiger does not explain how these alleged instances prejudiced the outcome of his trial. Additionally, our review of the record reveals counsel did not use incorrect legal definitions. Rather, the trial court asked that counsel refrain from getting into legal definitions as the jury would be receiving instructions from the court. T. 103. We therefore find no merit to Geiger's claim.

{¶ 37} Geiger next faults trial counsel for failing to object to the prosecutor's "obsessive comments and referral to a victim's bloody shirt and bullet holes" which caused the trial court to chastise the state for possible prejudice to appellant. Our examination of appellant's transcript reference leads us to the prosecutor's identification of a victim's clothing and two photographs identifying a victim's wounds during direct examination of the investigating detective. T. 225-227. We find nothing improper about the prosecutor's conduct and thus no cause for appellant's counsel to object. We further note that the trial court merely asked the prosecutor how many photos of the victim's wounds he intended to show the jury and cautioned against publishing more than had already been shown and risking prejudice to Geiger. T 227. We therefore reject this argument.

{¶ 38} Next Geiger argues trial counsel failed to adequately prepare. Specifically he accuses counsel of failing to review the transcript his interview with law enforcement. That allegation, however, is not borne out by the transcript. Nothing in the record indicates counsel failed to review the transcript. Rather, counsel requested that portions of the interview be redacted during direct exam of the detective that conducted the interview. T. 251-254. Outside the presence of the jury, the trial court expressed it exasperation with counsel for counsel's failure to indicate he desired portions redacted before trial began, not for failing to review the transcript all together as suggested by Geiger. Because the record does not support appellant's argument, we reject the same.

{¶ 39} Appellant next faults trial counsel for failing to secure the appearance of two witnesses at trial – Nathan Duncan and Joshua Carpenter. Appellant does not direct us to any portion of the record to support this argument. However, even if this alleged failure could be construed as being below an objective standard of reasonable representation, appellant does not explain what the testimony of these witnesses would have been, nor how it would have changed the outcome of his trial. Moreover, as the state points out, at trial, counsel for appellant indicated he subpoenaed Duncan and Carpenter simply to testify they were present at Monument Park on the day in question. T.II 59. At trial the parties stipulated to that fact. T.II 62-64. We therefore reject appellant's argument.

{¶ 40} Finally, appellant argues counsel rendered ineffective assistance during sentencing by failing to "mitigate investigation into appellant's history to his prejudice." Appellant does not elaborate on this statement or provide a transcript reference to explain what history he is referring to. We therefore reject his argument.

{¶ 41} The final assignment of error is overruled.

{¶ 42} The judgment of the Court of Common Pleas, Stark County Ohio is affirmed.

By Wise, Earle, J. and

Baldwin, J. concurs.

Hoffman, P.J. concurs separately.

EEW/rw

*Hoffman, P.J., concurring*

**{¶43}** I concur in the majority's analysis and disposition of Appellant's second and third assignments of error.

**{¶44}** I further concur in the majority's disposition of Appellant's first assignment of error, but do so under a different analysis as set forth in my concurring opinion in *State v. Westfall*, 5th Dist. Stark No. 2018CA00166, 2019-Ohio-4039.